In the Matter of the Proof and Probate of the Last Will and Testament of MARY E. BARBER, Deceased.

CORNELIA M. BARBER, Proponent, Respondent; FRANCES M. BENSON, Contestant, Appellant.

*Will — burden of proof as to the time when material alterations were made in it — an incomplete will — what required when it is sought to be established by one witness.*

Material alterations in a will are not presumed to have been made before its execution, in cases where the cancellation of certain matters is not explained, where suspicion arises upon the face of the paper, and, from surrounding circumstances, it is doubtful whether the cancellation was made before the execution of the paper.

A testatrix may make alterations in her will, but cannot reserve to herself the power of making future testamentary gifts by unattested instruments, and where one propounds an instrument for probate and it is doubtful whether alterations appearing therein were made before or after execution, the proponent must clear up the doubt.

Where it clearly appears that an alteration was made before the execution of a will, that portion of the will which was in existence at the time of the execution may be admitted to probate and the rest be rejected; but in doubtful

cases, where material provisions have been erased or altered and the court cannot determine from the proof whether the alterations were made before or after execution, probate must be refused to the whole instrument.

Where a proposed will is incomplete and it appears that the testatrix intended to dispose of more of her property before it should be complete, and the proof does not show that the instrument expressed the whole purpose and intent of the testatrix, it should be rejected.

The fact that a will is manifestly incomplete, and that one of two sisters of the deceased is disinherited by a cancellation of certain words in it, tend to show that it is not the last will and testament of the decedent.

A will may be established by the testimony of only one of the subscribing witnesses, but where this has been permitted, the testimony of the witness has usually been supported by the ordinary attestation clause, while the circumstances surrounding the execution and publication of the will, its reasonableness and its justice, have been in support of the evidence.

APPEAL by the contestant, Frances M. Benson, from a judgment and decree of the Surrogate's Court of the county of Cayuga, entered in said Surrogate's Court on the 10th day of August, 1895, adjudging to be properly executed and valid as the last will and testament of Mary E. Barber, and admitting to probate a certain paper writing propounded as the last will and testament of said decedent.

*John D. Teller*, for the appellant.

*William E. Hughitt*, for the respondent.

WARD, J.:

Mary E. Barber, a widow lady in the city of Auburn having considerable property, died on the 27th of January, 1895; she had no children or other descendants, and her heirs and next of kin were two sisters, Cornelia M. Barber and Mrs. Frances M. Benson. In March, 1895, Cornelia M. Barber, whom we shall style hereafter as the proponent, filed a petition with the surrogate of Cayuga county praying for the probate of what she claimed to be the will of the deceased. Frances M. Benson contested such probate and interposed objections thereto, and the issues thus made were tried before the surrogate, and the paper was admitted to probate as a will by the surrogate. At the time of the making of this instrument the mother of the deceased, a Mrs. Morgan, was alive, but subsequently, and in October, 1893, she died. The paper presented to the surrogate was written entirely in pencil and by the

deceased, except her signature and those of the two witnesses, Harriet A. Collins and Margaret W. Bostwick, which were written in ink.    It is written upon four half sheets of legal cap paper placed together and doubled once, forming a kind of a book, fastened at the point of doubling with a pin.    The pencil writing is on seven continuous pages as you turn to the left.    On the top of the seventh page there is simply the word " books."    It is important that we should give, as far as possible, a copy of this extraordinary paper with its erasures, blanks, marks, interlineations and cancellations.    We were favored upon the argument with the original instrument, and as far as it can be reproduced here, is as follows :

" I, Mary E. Barber being of sound mind and capable of making my will declare this will — dated June    1893 — as my last will and testament — all others made before this date, memorandums, &c., I declare null and void.

" 1st After my lawful debts are paid, and funeral expenses.

" 2  My house 37 Wm St. to be sold for whatever it may be sold ~~for~~ is to be divided as follows :

" 1st  To my faithful servant, Sarah Willis, 2,000 dollars cash — 1st of all.    If house sold for 20,000 it would leave a balance of 18,000 to be divided between the following named :

| | |
|---|---|
| " Nellie Barber, | ~~My mother, Mary E. P. Morgan,~~ |
| Alice Morgan Barber, | ~~My sister, Frances M. Benson,~~ |
| Julia Barber Elvers, | To my sister, Cornie Morgan Barber, |
| Elizabeth Coventry Barber, | ~~George Barber, 2nd,~~ |
| Mamie Morgan Avery, | My store, 112 Genesee St., abso- |
| Maggie Barber, | lutely free title now free from |
| Maudie, " George Barber 2nd, | any incumbrance. |

(page 2)

" If 37 Wm. St. should be sold for <u>more</u> or <u>less</u> it must be divided equally the same, giving each the <u>same</u> proportion, where I know my husband would wish it to go.

| | |
|---|---|
| Water bonds ~~1500 value~~ | 1500 value |
| Water stock now representing | 8000 |
| | 9500 |

To be arranged later. Should anything happen to me before this will is finished it must not go into litigation — brought about by my mother or any of my nieces, Mrs. Frances M. Benson's children, if so they must ~~will~~ be left with nothing and all go to "

(page 3)

" ~~to my sister, Cornelia McNeil, a marble bust of father~~ Barber ; to my sister Cornelia L. Barber's children. Of course my mother, who is now feeble and aged — probably will not outlive me. In that event she of course will be ~~taken~~ <sup>cared</sup> for by those left — My sister Frances M. Benson & Children

The interest in Times Building, if I have any at the time of my death, goes to my nieces, Mary P. Benson and Helen F. Benson Hunt, wife of Thos. M. Hunt — now of Auburn, N. Y."

(page 4)

" my silver ware

" Solid silver tea sett to go to Mary P. Benson if my mother has given her solid sett <sup>to</sup> which was given my sister Cornelia M. Barber, if not my sett is to go to my sister Cornie.

" Witnessed by                " MARY E. BARBER.

" HARRIET A. COLLINS.

(blot) MARGARET W. BOSTWICK."

The fifth page contains a list of twenty-two articles for table use, as silver knives, a large silver salver, a silver goblet, silver forks, a butter dish and other articles with " 1000 Thomas M. Hunt, 1000 Mary P. Benson, 1000 Edith Benson, 1000 Cornelia Benson, 500 Catharine Walsh, if living with me."

The sixth page has the same names of persons as on the fifth page, with the same amounts opposite their names, except that of Catharine Walsh, and, in addition, it contains the name Helen M. Hunt with " 1000 " opposite her name, with the aggregate figures under the amounts, of 5000 and below, the name of Sarah Willis, stricken out.

The seventh page is an entire blank, except that at the top occurs the word " books." This page does not appear in the printed case, but it does in the original paper presented on the argument. Pages 5, 6 and 7 are not signed or witnessed.

Margaret W. Bostwick testified in substance before the surrogate that she called at the house of the deceased in the evening upon which the alleged will was witnessed, for a friendly call and found Mrs. Collins (the other witness to the will) and the deceased; that Mrs. Collins was a nurse in the house and was attending the mother of the deceased, and that she (Miss Bostwick) asked the deceased if she had made a will, to which the deceased replied, in effect, that she had a paper all ready, and got the paper from a desk or drawer near by; that deceased sat down with the paper and read part of it, and the witness continues: "The beginning of the will; it began in a formal way. 'I, Mary E. Barber —' I don't remember exactly, but it was her last will and testament, and she being of sound mind and capable of making a will. I don't remember anything else. She was sitting in the same seat she left when she went to get it. When she stopped reading I think there was a little conversation in regard to the will and the signing of it. She read until she came to the provisions of the will; then she didn't read any further. Then she signed the will and we witnessed it, signing our names. Before signing she said she would sign it if we would witness it. * * * I think I said that I didn't know as it would be legal. She asked us to do it. She still had the paper in her hand. She fixed a place upon the table to lay the will, on the desk or table in the center of the room; we were sitting on one side of it. Then she signed her name with a pen and ink. Then we signed our names. We were in each other's presence. Mrs. Collins and I were sitting either side of a door; Mrs. Barber was at the end of the table. * * * I think it was Mrs. Barber who wrote 'witnessed by' at the left of the signature. I think it was after signing her name. * * * Mrs. Collins signed her name. * * * She was asked to * * * by Mrs. Barber, * * * Mrs. Barber asked me to." The witness further testified that the deceased was at that time of sound and disposing mind and memory and not under restraint.

On her cross-examination this witness said that she remembered that Mrs. Barber said that she wished Mrs. McNeil to have a certain bust; that there was considerable laughter during the time in the party about various things which were said; that the maid, Sarah Willis, brought in something to drink, of which the party partook, that was called root beer; that she was under the impression that

FIFTH DEPARTMENT, DECEMBER TERM, 1895. [Vol. 92.

the deceased said that she had left her library to Mr. Thomas Hunt (who had married a daughter of the contestant), and that she thought Mrs. Barber was at the time slightly under the influence of liquor.

The counsel for the contestant asked her if she had not made certain statements to him soon after the death of Mrs. Barber, and she admitted that she had told him that Mrs. Barber was at the time of the execution of the paper decidedly under the influence of liquor, and that in reply to a question of his if, in her opinion, the deceased was competent to make a will at that time, the witness had said that she certainly was not. The witness, however, stated that, after reflecting upon the matter for some time, she had concluded that she was mistaken in her statements made to the counsel and that the facts were as she had before stated them.

Mrs. Collins, the other witness, testified that she signed her name to the paper in the presence of the deceased, but did not see the name of the deceased upon the paper, and, she continued: "She (deceased) said, 'Girls, just for fun put your name on this paper. Sign this paper,' and then I wrote my name. * * * The paper was in my hands when I signed my name to it. I put it on a book to write my name. Miss Bostwick (the other witness) passed it to me to write my name. * * * Miss Bostwick was sitting by the table and I was sitting by the side of her, a short distance from her, about the same distance from Mrs. Barber. I signed my name and passed the book to Miss Bostwick. * * * Mrs. Barber was sitting at the west end of the long table in the library. After I signed, Sarah, the house maid, was going through the house. * * * She (deceased) called to her to bring some wine and cookies, which she did. Then we had a jolly time, talked and laughed. * * * I partook of a little of the liquor that was brought in and Miss Bostwick did. We partook of the cookies. Mrs. Barber did not partake of what was brought in in liquid form. * * * We were there about an hour and a half I think. * * * Aside from writing our names on the paper we were visiting and partaking of our lunch. * * * The first I heard on the subject of a will, Miss Bostwick said, 'Aunt Mollie, why don't you make your will?' * * * Mrs. Barber said she was going to make her will some time when she could. She called this paper she had a memorandum. She said she was going to when she had

finished out what she wanted to do with her things. She hadn't quite finished how she wanted to dispose of them. * * * She talked about having someone come to draw up her will. * * * She spoke about if she should get sick, of course she would like to have her things disposed of, have someone draw up a will and dispose of her things. She spoke about Mr. Thomas Hunt having the library. * * * She spoke of it several times that evening, then she spoke of pictures she wanted Miss Bostwick and me to have. * * * She said nothing further about disposing of her property. * * * Mrs. Barber went out and got a paper while we were there. She got it from a table drawer in the south library. When she started to get it she said she had a memorandum of what she wanted done with her — that she was going to have her will drawn up from this paper. * * * She unrolled it [the paper] and wanted to read it to us. She did not read any part of it."

The witness was asked if Mrs. Barber had read the portion of the will at its commencement, as stated by the other witness, and she was positive that it was not done; she further testified that the witnesses put their names at the places pointed out by the deceased. On her cross-examination, she said that she did not think Mrs. Barber was competent to make a will or devise real estate; that the deceased did not sign her name to the instrument that night, or write the words " witnessed by," as it appears; that she was intoxicated at the time, laughed a good deal and acted silly.

Theodore M. Pomeroy, of Auburn, an uncle of Miss Bostwick, testified that, in conversing with her shortly after the death of Mrs. Barber, she had said she didn't know whether Aunt Mollie (Mrs. Barber) had signed the will or not; that she (Aunt Mollie) " brought out a paper and wanted us (the witnesses) to write our names to it, and we did so, and that was all there was of it." Several witnesses testified to the declarations of Mrs. Barber, the deceased, that she had made a will. Others testified to her declarations that she had not made one, but intended to do so. Several witnesses testified, and indeed it seems to have been conceded, that the deceased, at the time of and prior to the making of the instrument, was in the habit of drinking intoxicating liquors, and at times became intoxicated. An expert witness testified that the cancellations, in some instances of material matters, of names

and amounts appear to have been made at a different time from that at which the matter canceled was written.

Indeed, upon an inspection of the original will, the lines drawn over the words " my mother, Mary E. P. Morgan," and " my sister, Frances M. Benson," and " George Barber, 2d," on the first page, and over " to my sister, Cornelia McNeil, a marble bust of father," and over " 1500 value," on the second page, appear in a heavier mark or hand than the other lines in pencil in the writing, and probably were made at a different time from the other writing and cancellations. There are nine distinct cancellations, five of which are of material matters. None of the cancellations are explained in any manner by the witnesses, or noted at the end of the will, or otherwise. The only recognition made of the mother, Mrs. Morgan, or of the sister, Mrs. Benson, in the paper, as originally written, was on the first page, and, as above shown, the clauses in which such recognition was made were stricken out. " George Barber, 2d," is also stricken out from the clause giving him an interest in the store on Genesee street. The mother is especially referred to in the third page as being feeble and aged, and as not being likely to outlive the decedent. The decedent assumed that in that event she would be cared for by Mrs. Benson and her children. As before said, the decedent survived her mother, who died after the making of the alleged will, in June, 1893, and the cancellation of the mother's name is suggested, at least, under the circumstances, that it was done after her death. The cancellation mark being 'of the same character over the devise to the contestant and to " George Barber, 2d," of the Genesee street store, is also suggestive that those cancellations were made at the same time as that of the devise to the mother. Material alterations or cancellations in a will or deed are not presumed to have been made before the execution thereof in cases like this, where no explanation of the cancellations is given, and where suspicion arises upon the face of the paper, and from surrounding circumstances, it is doubtful if the cancellations were made before the execution of the paper. (*Herrick* v. *Malin*, 22 Wend. 388; *Smith* v. *McGowan*, 3 Barb. 404; *Acker* v. *Ledyard*, 8 id. 514; *Wetmore* v. *Carryl*, 5 Redf. Surr. Rep. 544.)

A testator may make alterations in his will, but he cannot reserve to himself the power of making future testamentary gifts by unat-

tested instruments, and where one propounds an instrument for probate and it is doubtful whether the alterations were made before or after execution, the one propounding the instrument must make the doubt clear. (See *Wetmore* v. *Carryl*, *supra*, 549, 550, and cases cited.)

It is true that where it clearly appears that the alteration was made before the execution of the will, that portion of the will that was in existence at the time of the execution may be admitted to probate and the other rejected, but in doubtful cases, where material provisions have been erased or altered, and the court cannot determine from the proof whether the alterations were made before or after execution, probate must be refused and the whole instrument rejected.

It is the policy of our laws to surround the instrument that is to speak for the testator, after he has ceased to speak for himself in regard to the disposition of his property, with certain safeguards, so that the instrument shall embrace the deliberate and complete purpose of the testator on the subject, and it is because these safeguards have been shown by experience to be wise and necessary that the courts are tenacious in upholding them. If the paper is only a memorandum or a partial disposition of the property of the decedent, when he intended before his will should be complete to dispose of more of his property, or of the whole thereof, the paper, though signed and witnessed, may be rejected for incompleteness, and as not expressing the will of the decedent. " An objection that the document propounded as a will, or any part of it, does not conform to the real wishes and intention of the decedent, goes to the foundation of the instrument itself." If such an objection is sustained it is tantamount to a decision that the instrument, or a particular clause of it, is not the will of the decedent.

The points made by the appellant here are that this will should not only be rejected on account of unexplained erasures, cancellations and alterations in material respects, but because the assumed will was incomplete, and the proof shows that it did not express the whole purpose and intent of the decedent ; that it was not published as required by the statute, nor was the will signed by the testatrix and witnessed at the end thereof as the statute requires. As to the incompleteness of this will both of the witnesses to it testify that the decedent expressed a desire to give Mr. Thomas Hunt her library.

No reference is made to this library in the paper, before the signature, but on the seventh page the single word "books" occurs at the top, without further designation or any legatee named therefor. On the second page, after referring to "water bonds" and "water stock," this appears: "To be arranged later; should anything happen to me *before this will is finished*, it must not go into litigation — brought about by my mother or any of my nieces, Mrs. Frances Benson's children; if so they must be left with nothing and all go to." Then follows on the third page the words "to my sister." This clearly indicates that the present paper was an unfinished paper. This view is supported by the numerous blanks left in the paper where other bequests could be filled in as the deceased might desire. The fifth and sixth pages which are unsigned, being placed in this paper book in connection with and following the signatures, and containing the names of Mr. Hunt, his wife, and other natural objects of the testatrix's bounty, with amounts set opposite their names, would seem to indicate legacies that the deceased intended to bequeath; indeed, the whole paper bears evidence of incompleteness. It was not prepared by any one skilled in drawing such instruments, although the case discloses there was some talk of having Mr. Hunt or another legal gentleman draw the will. It is written in pencil, an unusual mode of writing instruments so serious and of so important a character. The decedent was a woman of superior intelligence, of considerable business capacity, and had had the management of her large property since the death of her husband, which occurred in 1886. It is hardly reasonable to suppose that, knowing the importance of this instrument and of its proper execution, if she were in her right mind, she would regard this paper as in any sense her last will and testament.

As to the due execution and publication of this will, one of the witnesses (Mrs. Collins) is positive that the decedent had not signed the paper when the witnesses signed it, and her testimony shows that there was no such publication of the will as the statute requires; that what was done by the deceased was that she produced the paper and requested it to be signed by the two ladies present, which they did, and which was done under conditions that did not exhibit the deliberate and serious intent of disposing of her property by will, but rather to the contrary.

The surrogate found the due execution and publication of the instrument, as against the affirmative evidence of the witness Collins, upon the evidence of the other witness (Miss Bostwick) alone. Giving her testimony the most liberal construction possible in favor of the will, it comes far short, in view of the other evidence in the case, of showing the due execution or publication of the will by the decedent; but Miss Bostwick is obliged to confess that before she had met with the proponent or her counsel after the death of Mrs. Barber, she (the witness) made declarations which, if true, prevent the probate of this instrument, and her recollection of the events connected with the execution and publication of this paper is seriously discredited by her declaration made when the subject was first called to her attention by Mr. Teller, the contestant's counsel, and by her uncle, Theodore Pomeroy.

It is true that a will may be established by the testimony of one of the subscribing witnesses, but in the cases where this has been permitted the testimony of such witness has usually been supported by an attestation clause setting forth the performance of all the statutory requirements as to publication, signed by the witnesses, and the circumstances surrounding the execution and publication of the will, and the reasonableness of the will, and the justice of its distribution of the property among the natural objects of the testator's bounty, or other persuasive facts and conditions have been before the courts to sustain the solitary witness on whose testimony the probate is made. Here, in the case before us, in addition to the manifest incompleteness of the will, one of the two sisters of the deceased is disinherited by a cancellation, and the leading circumstances of the case go to sustain the evidence of Mrs. Collins and her version of the affair as against that of the other witness who is solely credited by the surrogate.

These views lead to the conclusion that the decree of the surrogate should be reversed, with costs in favor of the appellant and respondent, to be paid out of the estate of the deceased, and the proceedings should be remitted to the surrogate of Cayuga county.

LEWIS, BRADLEY and ADAMS, JJ., concurred.

Decree of the Surrogate's Court of Cayuga county reversed, with costs to the appellant and respondent payable out of the estate, and the proceedings remitted to the Surrogate's Court of that county.