(29 Misc. Rep. 382.)

## In re DWYER'S WILL.

(Surrogate's Court, New York County.   October, 1899.)

1. WILLS—UNDUE INFLUENCE.

The fact that one who had for years successfully managed testatrix's property was appointed executor of her will, and directed to continue to manage her property, and out of the proceeds pay to himself an annuity in addition to the compensation he had theretofore received, does not in itself show that he exercised any undue influence over her.

2. SAME.

That testatrix's children, whom she had disinherited by a former will, and from whom she had been estranged, had conversations with her at which they had an opportunity to ask her to change her will so as to provide for them, is not sufficient evidence of undue influence to invalidate a subsequent will by which she gave the bulk of her property to them, where it also appears that about the time of its execution she was reconciled to them, and that they were afterwards with her most of the time until her death, and she several times expressed herself as pleased that she and her children had become reconciled.

3. SAME—TESTAMENTARY CAPACITY—PRESUMPTION—EVIDENCE.

The fact that testatrix, a woman 70 years old, who had been married three times, married a man about half her age while she was suffering from a disease which occasioned her considerable physical discomfort, and contributed to her death shortly after, is not in itself sufficient to rebut the presumption of sanity.

4. SAME.

Testatrix was afflicted with a disease which occasioned her considerable physical discomfort.  She had been married several times, and, though nearly 70 years old, married a man about half her age.  Her physical condition improved, and she gave directions to her servants and others looking towards her comfort, examined accounts, and conversed with various persons about her property and relations in a rational manner. The day after making her will, and a few days before her death, she took a pleasure trip with her children, and appeared to enjoy herself. *Held*, that testatrix was of sound mind at the time of the execution of the will.

5. SAME—ALTERATION—BURDEN OF PROOF.

Where a will presented for probate shows on its face that words have been erased with a chemical, and other words written therein, so as to make a material alteration in the terms of the will, and no statement is made in the will that such alteration was made before execution, the burden of showing that it was so made rests on proponent.

Contest of the will of Jane A. Dwyer by Jennie Caldarazzo and another.   Probate decreed.

L. S. Goebel and Wm. J. Hardy, for proponent.
John R. Abney, for contestants.

VARNUM, S.   This case was tried before my predecessor, Mr. Surrogate ARNOLD, and submitted to him in 1897, but, not having been decided by him, comes to me for decision.   The paper propounded as decedent's last will was bitterly contested upon the grounds of undue influence and lack of testamentary capacity, and also upon the claim that one or more alterations had been made in the instrument after its formal execution by her.   The gravity of these contentions, especially the latter, has necessitated a most careful and laborious examination of the voluminous testimony,—more than 1,200 typewritten pages,—and of the exhibits, including

four prior wills, and also of the authorities bearing upon the questions of law involved. The decedent, Mrs. Dwyer, known until about six months before her death as "Jane Tamajo, Duchess della Castellucia," died on August 2, 1895, being then about 70 years of age. She resided at the Burlington, an apartment house in Thirtieth street, which was owned by her, and constituted the bulk of her estate. She seems to have had a special predilection for matrimony and for the making of wills, as it appears that she was four times married, and it is in evidence that she made at least five wills during the last few years of her life. The last marital adventure occurred in Florida, where, in February, 1895, some six months before her death, she married one Dwyer, a man about half her age, who promptly left her on the day after the marriage, and, as the testimony shows, never lived with her on her return to New York. He made her a few apparently amicable visits here, until she forbade him access to her apartment,—chiefly, as it would seem, because of his coming there on one or two occasions in an intoxicated and maudlin condition. This Mr. Dwyer is now one of the contestants of the will propounded for probate; the only other contestant being a granddaughter of the decedent, Jennie Caldarazzo, née Ungaro, the child of a deceased daughter. The testatrix left, as her only heirs at law and next of kin, in addition to the granddaughter above named, a son, Frederick F. Beals, and a daughter, Evelyn J. Hudnut. The testimony shows clearly that at different times specified the decedent was not on good terms either with her granddaughter or with one or the other of her children. This is clear, also, from the provisions for disinheritance in the wills. It likewise appears that she was deeply interested in the management and success of the Burlington, which had been managed for many years for her by one William T. Coale, and that in 1892, during the lifetime of her third husband, Tamajo, she and the latter executed an agreement with Coale, engaging him to continue the management of said house for 10 years, at a salary of $1,800 a year; such agreement not to terminate with the death of either or both of them. In this connection it is proper that I should state, as far as material, and as briefly as possible, the dispositions contemplated by her said five wills. The paper now propounded as the last will bears date July 16, 1895, about two weeks before her death. In it she provides that said William T. Coale, who is described as having for a number of years been a faithful and efficient manager of the Burlington apartment house, shall continue to conduct and manage the same during the term of his natural life in the same manner, so far as practicable, as before; he to have the use of the house, furniture, etc., for that purpose, without impeachment for waste. Out of the income of said premises he is first to pay himself a sum equal to the amount that he had been receiving as manager, together with the further sum of $1,000 each year during his natural life. Next he is to pay all necessary expenses of carrying on the business, such as taxes, repairs, and interest on mortgages, and from the balance of income, after such payments, to pay to Jennie Caldarazzo, the granddaughter above named, $2,000 each year during her life. After

this annuity, he is to divide the residue of said income in substantially equal shares between Evelyn J. Hudnut and Frederick F. Beals, children of the testatrix.    Upon Coale's death the said apartment house is devised to the two children above named, subject to the payment of the annuity of $2,000 to said granddaughter, and to said children is also given any residuary estate.    It is further provided that there shall be no interference with Coale in the management of the said house by any of the parties in interest, and that the share of any party contesting the will shall be forfeited.    Mr. Dwyer, above named, is mentioned only in the following language:    "Having already given my husband, Edward L. Dwyer, at various times, money and other property, I hereby give to him the sum of $10, and nothing more."    Finally Mr. Coale and the decedent's lawyer, Mr. William V. Simpson, are designated as executors, and all prior wills revoked.    Of such prior wills there are, as already indicated, four in evidence.    The earliest one (that of October 3, 1890) was made during the lifetime of her former husband Tamajo.    After creating sundry annuities for the lives of the respective annuitants, decedent thereby gave the use of the apartment house for life to her said husband, "to be conducted, so far as possible, as it now is by me"; said husband to pay one-half of income to her granddaughter, who is to have the whole income upon his death or remarriage.    The residuary estate is also given to the husband, and Coale, Simpson, and he are appointed executors; the first named receiving a legacy of $1,000.    In this will, Beals, the son, is cut off with $10, because of unkindness, ingratitude, and other specified wrongs.    Decedent's third husband, Tamajo, otherwise known as the "Duke della Castellucia," died in the spring of 1893; and on June 19th of that year his widow made another will, whereby she gave the apartment house to Coale for life, on the same general terms as in the will of July 16, 1895.    The net rentals, after a small annuity to a sister, are to be divided between her granddaughter, Jennie, and her son, Beals, and his four children, share and share alike.    They are likewise to divide all the property after Coale's death.    Messrs. Coale and Simpson are made executors, and any contestant is to forfeit his or her share, as in the will of July, 1895.    By this will of 1893 it is her daughter, Mrs. Hudnut, that is cut off with $10, and Mr. Coale is given $1,000 a year in addition to his regular compensation, the same as in the will propounded.    On March 19, 1895, a new will was made.    Precisely the same provision is made for Coale, and against interference with his management of the Burlington, as in the will now under contest, except that he is not given the extra annuity of $1,000 a year.    The net income of said property is given, 75 per cent. to the son, Beals, 15 per cent. to the granddaughter, Jennie, and 5 per cent. each to a nephew and niece, with division of the principal on Coale's death in substantially the same proportions; the shares of nephew and niece, however, on their respective deaths, to go to her son.    Simpson and Coale were again named as executors, and the daughter, Mrs. Hudnut, again cut off with $10, as in the will of 1893.    Ten days later, on March 29, 1895, a fourth will was made, in substantially the same terms as that of March

19th, except that it contains provisions for small annuities to her late husband's sisters, and for certain specific legacies, and also the same provisions regarding Dwyer, her last husband, as found in the will here contested. Moreover, the clause giving Coale his extra compensation of $1,000 a year is restored. To this will a codicil was made on April 13, 1895, whereby the decedent provided that the distribution of the net balance of income should be changed so as to give 50 per cent. to her son, 11 per cent. to her granddaughter, 11 per cent. to the nephew, and 11 per cent. to the niece mentioned in the wills of March 19th and 29th, 11 per cent. to another niece, Mary Cornwell, and 6 per cent. to decedent's daughter, Mrs. Hudnut. The clause disinheriting her is, of course, revoked, and the will of March 29th confirmed, except as changed by said codicil, which, however, gives the entire Burlington property, after the death of Coale, to the decedent's son, Beals, in fee, subject to the payments of income aforesaid, and, in case of a sale of the property, to certain other payments. I may add here that it seems that the decedent contemplated at least one change which we have no evidence that she ever carried into execution; for in a written memorandum sent to her attorney, Mr. Simpson, about January 19, 1892, she expresses the wish to have the names of her granddaughter, Jennie, and her daughter, Mrs. Hudnut, stricken out of her will (presumably that of October 3, 1890). She says she will not let them have a cent of her money; adding about said Jennie that she is "one bump of deception and temper,"—"the most ungrateful of all."

I have given an extended account of the various changes contemplated or effected by these papers, not only because great stress was laid upon them by the contestants as indicating a mind weak, and easily influenced by others, but also because, in the view I take of the case, these instruments, progressive in their changes, speak strongly in favor of the decedent's capacity, and of the validity of her last will. From a consideration of them and all the testimony in the case, I find that no undue influence was exerted upon the testatrix by any person or persons. As to Mr. Coale, it appears from all the testimony that the disposition of the apartment house after her death was a subject of deepest interest to her, and that she desired him to retain the management of it for the best interests of her beneficiaries. This is shown by the original 10-years agreement made in 1892, not terminable by her death, and by the provisions in all the successive wills. There is, moreover, no testimony satisfying me that in any way he abused his intimate business relations with her; and the same is true as to Mr. Simpson, her attorney. Concerning her son and daughter, it is only shown that they (especially the latter) had interviews with the decedent at which it is possible to infer that they may have asked her to change her will; but it is not undue influence for a beneficiary to ask, even to importune, a testator to make a provision in his favor, provided the testament, when made, reflects, not the beneficiary's, but the testator's, will. In re Seagrist's Will, 1 App. Div. 615, 619, 37 N. Y. Supp. 496; Tyler v. Gardiner, 35 N. Y. 559. Undue influence must be proved, not assumed. Loder v. Whelpley, 111 N. Y. 239, 250, 18

N. E. 874. And in this case it appears by the preponderance of testimony that, whatever testatrix's relations with her children may have been prior to April, 1895, she became reconciled to them about that period, and they were afterwards with her most of the time, accompanying her to West Point after the making of the will of July, 1895, and remaining with her until her death; and, further, that the decedent several times expressed herself as glad that all her children were with her again. Moreover, the will under consideration is not, in my judgment, an unfair or unnatural one. A faithful employé is retained to manage the real estate during his life for the best interests of her beneficiaries, the compensation provided for him being in no way unreasonable. Her son and daughter are the principal beneficiaries, and her granddaughter, Jennie, receives an annuity of $2,000 for life. The exclusion of her last husband, Dwyer, from any participation in the estate, seems eminently natural and proper, under the circumstances. The various and somewhat rapid changes made in the testamentary intentions of the testatrix, assuming the wills to represent them correctly, all show the intent to have Coale manage her property, and are, to a certain extent, progressive, in that they reflect a rise or fall in her good graces of the natural objects of her affection and bounty; and if, as I believe, the disposition effected by any particular will coincides with the state of her feelings at or about the date of its execution, this would seem to constitute a strong presumption against the existence of undue influence.

Reserving for the present the question as to alterations in the will, there is no serious dispute as to the factum, which seems properly established. The claim is made, however, in connection with that of undue influence, that the testatrix was not, by reason of disease, of proper testamentary capacity at the time this will was executed. Prior to January, 1894, no question is made but that she was of normal mental capacity, although it would appear that as early as that she was afflicted with Bright's disease, which subsequently became chronic, and seems to have been the cause of her death. It was not until December of 1894, however, that her illness became critical. In that month it is in evidence that she began to show many of the symptoms of a chronic case of Bright's disease, such as indigestion, insomnia at night, alternating with drowsiness by day, considerable nervousness, dropsy (although this developed mostly in the months of February and March next ensuing), shortness of breath, and discharges of albumen in the urine. In this month, moreover, it was determined at a consultation of physicians that she was suffering from that disease, and she was advised to go to Florida. She went there accordingly, being accompanied by a trained nurse and by Mr. Dwyer, who appears to have been engaged to her at that time, and who subsequently married her there, as already stated. This was in February, 1895, when she was, for the most part, confined to her room in the hotel and exhibiting all the symptoms of her disease, including the dropsy, in a very aggravated form. This marriage, in my judgment, is the circumstance in her life most calculated to throw doubt upon the

soundness of decedent's mind; but, however I might feel with regard to it, had it been followed by a will in favor of her new husband, or had she exhibited other marked eccentricities, I do not, under all the circumstances of the case, regard it as sufficient to mark her as of unsound mind, or, indeed, to raise a serious question as to her capacity. While the burden of proof is, of course, on the proponents to prove capacity, they are aided by the presumption of sanity. In re Barbineau's Will, 27 Misc. Rep. 417, 59 N. Y. Supp. 375, and cases cited. And, in my opinion, the circumstance of her marriage, standing alone as it does, is insufficient to rebut this presumption. With the exception of this foolish marriage, there is nothing in the evidence that throws any doubt on the soundness of decedent's mind, while, on the other hand, there is abundant evidence that "she knew what she wanted," and was accustomed to give directions to her servants and others looking towards her comfort and benefit, to examine accounts, to converse with various persons about her property and relatives, and, in short, to act in an entirely rational and normal manner, during substantially the entire period between December, 1894, and her death. It is clearly shown, moreover, that while she was quite ill, physically, when the two wills were executed, in March, she improved greatly in health between the last of April and the middle of July; her dropsy disappearing completely, and her insomnia, nervousness, somnolence, and other symptoms being much ameliorated. The very next day after making the will offered for probate she made the trip up to West Point, chatting with her doctor and others on the train; and while at West Point she appeared in good health for a person of her years, and appeared to enjoy herself there and to improve until about two days before her death, when she complained of indigestion, and a local physician was consulted. This attack was not deemed serious, however, until the afternoon of the day before her death, when, after partaking of a hearty dinner, she complained of having eaten too hastily, clasped her hand to her heart, and suddenly lapsed into unconsciousness, from which she never rallied. She died some 12 to 14 hours thereafter. I am satisfied from this evidence as to the progress of her disease and the condition of her health, combined with the evidence of her acts and sayings, of which I have given an outline above, that the decedent was of sound mind at the time of the execution of the will.

It only remains to consider whether or not the fact that there are peculiarities in the appearance of the paper propounded, and one or two erasures and alterations therein, should cause the same, which appears to me to express the testamentary intention of a decedent of sound mind and memory, to be refused probate. The will, it should be stated, is entirely in the handwriting of Mr. Simpson, the decedent's attorney; so any alterations were made by him. The peculiarities pointed out by the expert on handwriting who testified for the contestants are, briefly, that the first and second pages are written on a half sheet of paper, larger and of a different milling from the rest of the will, and are in a running hand, which spreads much more than the writing of the following pages,

which is an engrossing backhand, changing to a running hand towards the last. This criticism seems sound. The expert testifies, in the second place, that the words "two thousand," in the clause heretofore noted, which gives an annuity of that amount to decedent's granddaughter, are written over an erasure made with chemicals; and this is admitted, and is the most serious change. Indeed, I regard it as the only serious change; for though the expert points out another erasure, made, he thinks, with hard rubber, it is so slight that I do not think it calls for explanation, under the rules of law I am about to consider. Nor do I think it important that, in the opinion of the expert, the signature of William V. Simpson, the third witness to the alleged will, was in a different ink from the other signatures, as it is sufficiently established by the testimony of the subscribing witnesses that Mr. Simpson signed in due course at the time of the execution of the instrument. The rule as to an alteration or an erasure in a will is, I think, that if it is material, and if there are any suspicious or doubtful circumstances growing out of the mode of the alteration, the ink in which it was made, the fact that it was in favor of the party holding the instrument, and that it was not noted at the bottom, then the presumption is that it was made after execution; but it is for the court to decide whether, under all the circumstances, it was made before or after. Crossman v. Crossman, 95 N. Y. 145; In re Carver's Estate, 3 Misc. Rep. 567, 23 N. Y. Supp. 753; In re Barber's Will, 92 Hun, 489, 37 N. Y. Supp. 235. If, however, the alteration is fair upon the face of the instrument, there would seem to be no presumption that it was made after execution, although it be entirely unexplained. Crossman v. Crossman, supra; In re Voorhees' Will, 6 Dem. Sur. 162; In re Wood (Sur.) 11 N. Y. Supp. 157. Applying this rule to the case under consideration, it was incumbent upon the proponents to explain the peculiarities I have noted, and I think this has been satisfactorily done. While the evidence of Mr. Simpson given for this purpose differs in some material points from the evidence given by him on the same subject at an earlier stage of the trial, it does not differ to such a degree as to convince me that he intended at any time to depart from the truth. His evidence is, moreover, supported by the penciled changes written on the will of March 29, 1895, which he testifies that he used as a draft for that now in question. They have every appearance of being honestly made, and were not attacked at all by the expert. I consider, also, the absence of proof of any adequate motive on the part of Mr. Simpson for making an alteration in the will after decedent's death, assuming him to be capable of such an act, and in this connection also consider all the other circumstances which I have mentioned, and which led me to conclude that the paper actually represents her testamentary wishes. Then, too, the fact that the first and second pages of the will of March 29, 1895, are exactly the same as the similar pages of the will offered for probate, renders it exceedingly improbable that these pages of the latter have been, as intimated by the contestants, tampered with since its execution

In my opinion, therefore, the peculiarities confessedly existing in said will are sufficiently explained and accounted for, and it is admitted to probate.

Probate decreed.