**CITY NAT. BANK v. SLOCUM. DELAWARE NAT. BANK v. SAME. HALLIDAY et al. v. SAME.**

(Circuit Court of Appeals, Sixth Circuit. April 15, 1921.)

Nos. 3442–3444.

1. **Courts ☞260—In suit involving will federal court can construe, but cannot determine contents.**

   In a suit by a trustee in bankruptcy to set aside an alleged preferential mortgage and remove clouds from the bankrupts' title created by a will containing interlineations and erasures, the United States District Court has no probate jurisdiction and may construe the will, but cannot determine its contents.

2. **Wills ☞417—Decree admitting to probate construed when asserted in another court.**

   A decree admitting a will to probate, like every other decree which forms the basis of rights asserted in another court, must be examined and construed to determine its force and effect if there is room for construction.

3. **Wills ☞432—When order admitting to probate is ambiguous, natural and rightful construction will be adopted.**

   Where interlineations and erasures in a will were reproduced on the record of the court admitting the will to probate with nothing to indicate whether or not the probate court regarded them as effective, another court, in which the construction of the will is involved, will consider what the probate court ought to have done, and, if one construction of its order makes it natural and rightful, and the other makes it erroneous, will follow the former construction.

4. **Wills ☞107—Interlineations and erasures made before execution are part of will.**

   Interlineations and erasures in a will presented for probate form part of the will when obviously made before the will was executed, and the will as so changed and altered is the one which should be received.

5. **Wills ☞107—Interlineations and erasures made after execution of no effect unless showing cancellation.**

   Interlineations and erasures made after the execution of a will are of no effect whatever unless they sufficiently support an inference of cancellation.

6. **Wills ☞289—No presumption as to time of interlineations and erasures, but burden on proponent.**

   There is no presumption of law that interlineations and erasures in a will were made before or after execution, and the inference to be drawn is always one of fact, with the burden of proof on the proponent to show that any alteration which he wishes to be considered effective was made before execution.

7. **Wills ☞289—Noting of changes in attestation clause supports inference that they are part of will.**

   When changes in a will are noted in the attestation clause, this supports the resulting inference of fact that they are part of the will, but

the absence of notation may or may not be suspicious, depending on the extent of formality and care that seems to have been observed.

8. **Wills ☞302(4)—Conclusion that interlineation was made before execution held warranted.**

Where a will as originally written gave property to H. "& the heirs of his body," but the words "in trust for" had been interlined diagonally through the "&," the conclusion *held* warranted that the interlineation was made before execution of the will.

9. **Wills ☞302(4)—Conclusion held warranted that line through words was made after execution.**

Where a will gave property to H. in trust for the heirs of his body, and a light and barely noticeable line was drawn through the words "in trust for" and a pencil line through the words "heirs of his body," the inference *held* warranted that the erasures were made after execution.

10. **Wills ☞600(2), 692, 693(4)—Devise to heirs held within power of appointment to daughter and "issue of her body."**

Assuming that a will giving property to the testator's wife and requesting her to make wills, "keeping in mind my beloved daughter * * * and the issue of her body," gave the wife a life estate only with power of appointment to the daughter and her issue, a devise by the wife to the daughter for life with remainder to the daughter's only son in trust for the heirs of his body was within the power given, as "issue of the body" is commonly used in a less restricted and technical sense than "heirs of the body," and will be construed to include grandchildren unless the circumstances otherwise require.

[Ed. Note.—For other definitions, see Words and Phrases, Issue of the Body.]

11. **Perpetuities ☞4(20)—Will as supplemented by power of appointment held not to grant estate to party not in being.**

Where a will gave the testator's wife a power of appointment, and she devised property to a daughter for life with remainder to to the daughter's son in trust for the heirs of his body, the first will, as supplemented by the power of appointment, did not grant any estate to any person not in being.

12. **Bankruptcy ☞140(3)—Property held in trust for heirs of body does not pass to trustee.**

One to whom land was devised in trust for the heirs of his body had no title which he could mortgage or convey or which passed to his trustee in bankruptcy.

13. **Bankruptcy ☞143(1)—Life estate passes to trustee.**

A life estate can be mortgaged by the life tenant and passes to her trustee in bankruptcy when of substantial value.

14. **Bankruptcy ☞166(4)—How question of preference determined when bankrupt's liabilities were as surety stated.**

Where a mortgagor's only liabilities were as accommodation indorser on her son's notes, only such deficiency in the son's assets as ought to have been feared should be taken into account in determining whether the mortgagee had reasonable ground for believing that the mortgagor was insolvent so that a preference would result.

15. **Bankruptcy ☞166(4)—Mortgagee held without reasonable ground to believe mortgagor whose liabilities were as surety was insolvent.**

Where a mortgagor's only liabilities were as accommodation indorser of her son's notes, the mortgagee *held* to have no reasonable ground for believing that the son was so badly insolvent as to render the mortgagor insolvent so that a preference would result.

16. **Bankruptcy ☞303(1)—Burden on trustee to show mortgagee had reasonable ground to believe mortgagor was insolvent.**

The burden of proof is on a trustee in bankruptcy suing to set aside an alleged preferential mortgage to show that the mortgagee had reason to

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

believe the mortgagor was insolvent, and the burden of proof was not changed by the amendment of 1910 of the Bankruptcy Act.

**17. Bankruptcy ☞166(4)—Statute adopted prior judicial definition of "reasonable cause to believe."**

When the Bankruptcy Law (Comp. St. §§ 9585–9656) was enacted, the phrase "reasonable cause to believe," as applied to a preference, had been judicially defined to mean, not mere suspicion, but such knowledge of the facts as to induce a reasonable belief, or cause for well-grounded belief, and such definition followed the phrase into the statute.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reasonable Cause.]

**18. Bankruptcy ☞440—Suits to set aside preferential transfers held reviewable by appeal.**

In a suit by a trustee in bankruptcy to set aside a mortgage and a cash payment as preferential, where the matters involved took such shape that it was necessary for the Circuit Court of Appeals to pass upon the facts, the decree was reviewable by appeal as distinguished from petition to revise.

Appeal from the District Court of the United States for the Eastern Division of the Southern District of Ohio; John E. Sater, Judge.

Suits by Ed. Slocum, trustee in bankruptcy of John Joy Halliday and Annie Joy Halliday, against the Delaware National Bank and others. From the decree the City National Bank, the Delaware National Bank, and Ruth Halliday and others separately appeal. Reversed, modified in part, and bill dismissed in part.

Chas. J. Pretzman, of Columbus, Ohio (Harry N. Crist, of Delaware, Ohio, on the brief), for appellant banks.

Smith W. Bennett, of Columbus, Ohio (Berne Jones, of Delaware, Ohio, on the brief), for appellants Halliday.

Geo. W. Carpenter, of Columbus, Ohio (Eugene S. Owen, of Delaware, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. John Joy Halliday resided upon a Southern Ohio farm and there carried on an extensive creamery business, and had become largely indebted, the Delaware National Bank being his chief creditor. His mother, Annie Joy Halliday, lived with him and had indorsed many of his notes. In November, 1916, the mother and son were severally adjudicated bankrupt, and Mr. Slocum was made trustee of each estate. He filed a bill in the court below against the bankrupts, attacking, as a preference, a mortgage covering the farm, which the mother and the son had given to the bank within the four months period. In the same bill he set up that the bankrupts' title to the farm had come from Mr. Halliday's grandfather, Thomas Joy, and alleged that others of the latter's descendants or next of kin were claiming title adverse to or supplementary to that of the bankrupts, and prayed not only to set aside the preference, but to have these clouds removed from the title of the bankrupts. He also filed a separate bill in behalf of the mother's estate against the bank, alleging that a $10,000 cash payment to it and the giving of a pledge of certain

stocks had been preferences, and asking to have these vacated and the money and stocks restored to the estate. There were extensive and complicated pleadings, but both cases were finally heard together in the court below. It was adjudged that the bankrupts had held the entire legal and equitable title to the farm, that the mortgage on the farm was a forbidden preference and should be canceled, and that the $10,000 payment had been preferential and must be refunded. The pledge of stocks is not mentioned in the decree, but apparently the trustee abandoned his attack upon it. From these decrees there are appeals: First, by the minor children of John Joy Halliday, who claimed to own the fee to the farm; second, by the City National Bank of Columbus, which was the purchaser and owner of the preferential farm mortgage; and, third, by the Delaware National Bank, which was ordered to refund the $10,000 payment. The detailed facts are so complex that they can be stated better in connection with the discussion of the separate questions.

An inquiry into the title to the farm involves the original owner, Thomas F. Joy, his widow, Lettie Ann Joy, who survived him many years, their daughter, Annie Joy Halliday, her son, John Joy Halliday, and his three children, Ruth, Anna, and Elizabeth Halliday. To avoid confusion in names, and for convenience, these parties will be hereafter referred to as the grandfather, the grandmother, the mother, Halliday, and the children. The title comes through, or is affected by, the successive wills of the grandfather and the grandmother. We think it more logical to determine, first, the effect of the grandmother's will. Whether she was disposing of her own estate or whether executing a power or a trust is not important to this branch of the inquiry. Her will was executed May 3, 1890, and was admitted to probate in Delaware county August 28, 1916. The substantial part of the will, including the interlineation and without regard to the alleged erasure, is as follows:

"I. I give and bequeath to my beloved daughter, Anna J. Halliday, all the personal property of every description which may be in my possession at the time of my death.

"II. The use & control of the real estate I give & bequeath to my daughter Anna during her natural life.

"III. Should my grandson, Joy Halliday, then be living, I give & bequeath to him in trust for the heirs of his body all the real estate of which I may be possessed at the time of my decease.

"IV. In case my grandson should die without issue, I give & bequeath one-half of all my real estate to the Ohio Wesleyan University of Delaware, O. The other half I desire should be divided among the brother and sisters of my beloved husband or their children."

The question which we must decide, as to what we ought to treat as the contents of the will, arises under paragraph III. When the will was first written, the phrase in question read "bequeath to him & the heirs of his body." At some time or times the words "in trust for" had been written in the form of an interlineation extending diagonally both below and above the line, and across and largely covering up the "&," an ink line had been drawn through the words "in trust for," the line being broken so as to be separate for each word, and a pencil

line had been drawn through the words "the heirs of his body." The will therefore may be read, according as attention is or is not paid to these indications of change, in three different ways (all subject to the mother's life estate): (1) "To him and the heirs of his body"; (2) "to him in trust for the heirs of his body;" (3) "to him." The first form, it is agreed, would, under the laws of Ohio, create an estate in fee tail, giving a life estate to him and remainder to his children. The parties also agree that the second form would give him no beneficial interest. The third form, it is said, would give him the fee, although that will call for attention later.

[1, 2] The court below had no probate jurisdiction. It might construe a will, but it could not determine the contents. That power of determination rested solely with the court which admitted the will to probate; but the decree of that court, like every contract or decree which forms the basis of rights asserted in another court, must be examined and construed to determine its force and effect, if there is room for construction. This probate order, seen in the light of admitted surrounding facts, at once indicates an ambiguity. As the will was filed for probate, it was in the condition which has been described; that is to say, the words "in trust for" were interlined in place of the "&," an ink line was drawn through these three words, and a pencil line drawn through the words "heirs of his body." The order recited that the matter came on to be heard on the petition to admit to probate and record a will "heretofore filed in this court therefor," that notice had been given, and that the subscribing witnesses had testified to "the due execution and attestation of said will," and proceeded:

"Whereupon the court finds that the aforesaid instrument of writing is the last will and testament of the said Lettie A. Joy, deceased. * * * It is therefore by the court ordered that the said will be admitted to probate, and that it * * * be entered of record in this court."

Thereupon the will was entered at length upon the court records; and its condition, as above stated, was in all details reproduced upon the record, except for the "&," and except for the distinction between an ink line and a pencil line; that is to say, the clause was first written "to him in trust for the heirs of his body," and then an ink line was drawn through the words "in trust for the heirs of his body." It was doubtless intended thus to find that the will at the testatrix's death, and as left by her, was in the condition so reproduced; but was it the intention of the probate proceeding, taken altogether, to declare that these words had been erased before the will was executed and so were no part of it, or rather that these words were then present and thus formed a part of the effective will? Neither intent is inconsistent with what was done. The drawing of the lines through the specified words as written upon the record tends to show that they were not to be considered as present in the instrument recorded. On the other hand, any reproduction at all of these words upon the record was unnecessary, unless it was intended that they were effective. It was the duty of the court to record only the words and phrases which constituted the will, and the erasing line may well indicate that it was merely in-

tended to preserve the form which the instrument had when presented to the court.

[3] Confronted, then, with this doubtful question of intent, how shall it be resolved? In considering an ambiguous contract, the courts, lacking a better aid, assume that the parties intended the thing which was reasonable and natural and which it may be presumed they would have done, rather than the unreasonable and improbable; in construing a doubtful order of the court below, the reviewing court presumes that it was intended to be as it should have been, and will not read such an order so as to make it erroneous if it may as well be read so that it is right. We see no reason why we should not treat this question in the same way, and consider what the probate court ought to have done in this respect, in order that, if it shall appear that one construction of its order makes it natural and rightful and the other makes it erroneous and the implied intent improbable, we may be thereby led to the former inference.

[4-7] When a will is presented for probate and discloses interlineations and erasures, it is obvious that, if they were made before the will was executed, they form a part of it, and the document, as so changed and altered, is the one which should be received; while, if they were made after execution, they form no part of the will and are of no effect whatever, unless they sufficiently support an inference of cancellation. It is claimed, on one side, that there is a presumption that such changes were made before execution, and, on the other, that the contrary presumption prevails, and it is said that there is a conflict of authority on this subject. We have made as thorough an examination of the cases cited and others as we can, and, while there are decisions indicating that the judges supposed there was a presumption one way or the other, we are satisfied there is no substantial conflict, and that the true rule is that there is no presumption of law; that the burden of proof is on the proponent to show that any alteration which he wishes to be considered effective was made before execution; but the face of the paper and the obvious circumstances may amply meet that burden, and the inference to be drawn is always one of fact. If the will is drawn and executed with full formality and under careful advice, it is customary to note such changes in the attestation clause. If so noted, this supports the resulting inference of fact that they are part of the will; if not, absence of the notation may or may not be suspicious, depending on the extent of formality and care that seems to have been observed; and the changes may be, in themselves, suspicious enough to indicate that they were made later, or so natural and probable as to support the contrary inference. These conclusions we draw from Wilton v. Humphreys, 176 Mass. 253, 257, 57 N. E. 374; O'Connell v. Dow, 182 Mass. 541, 552, 66 N. E. 788; Wetmore v. Carryl, 5 Redf. (N. Y.) 544; Re Dwyer's Will, 29 Misc. Rep. 382, 61 N. Y. Supp. 903, 909; Crossman v. Crossman, 95 N. Y. 145, 153, 154; Underhill on Wills (1900) § 268; Greenleaf's Ev. § 564. Cases like Toebbe v. Williams, 80 Ky. 661, and Franklin v. Baker, 48 Ohio St. 296, 303, 27 N. E. 550, 26 Am. St. Rep. 547, overlook the distinction between ordinary contracts and wills, pointed out in Page on Wills

(1909) § 432; and cases like Teed's Estate, 225 Pa. 633, 637, 74 Atl. 646, 133 Am. St. Rep. 896, are found to depend on inferences of fact peculiar to the case.

[8] The first change in this will is found in the insertion of the words "in trust for." This change is not noted in the attestation; but, in the first place, it was so placed in the line and so completely superseded the mere character "&" that there would seem no such necessity for notation as in many cases there would be; and, in the second place, the will was drawn by and executed before a justice of the peace, and exhibits a disregard of much formality, beyond the statutory requisites. Then we find that these words are plainly in the handwriting of the scrivener, apparently written with the same pen and with the same ink as the body of the will. It is against common experience and natural presumption that, if this scrivener was called in and made this change at a later date, he should have done so with the same pen and ink and without any re-execution. It is clear to us that the entirely natural inference from this situation is that these words were written before execution, and that no other inference would have been drawn by the probate judge, unless supported by clear testimony. In addition, it appeared upon the trial of the present case, by expert testimony, that these words were written over and across the character "&" before the ink thereon was completely dry, and while this testimony was appropriate to the probate court issue as to contents, but did not bear upon construction, it indicates what really appears upon the face of the papers which were before the probate court, and tends strongly to convince that no wrong can come from our conclusion that the probate court should be deemed to have intended to include these words in the instrument which it admitted to probate.

[9] We next consider the line drawn through these three words. We have no doubt that this erasure should be inferred to have been made after execution. To write in these words, and then at once to strike them out, would not only be an extraordinary and unusual thing, but, if that had been done, the erasure would naturally have been strong and positive so that the words would have been clearly canceled. Instead of that, on account of the light and delicate character of the erasing line and its entire absence between the words, it is almost unnoticeable. It is the kind of mark much more likely to be made by an inexperienced person who was considering a revision or change and contemplated that these words should not be included in a new draft. The natural inference, and the one which we attribute to the probate court, is that these lines were drawn at some time after the execution of the will, and by the testatrix or some one else while considering the subject of changes.

The remaining change—the drawing of the line through the words "heirs of his body"—must be deemed post execution, for two reasons: The first one is that no testator or scrivener, intending even as much formality as was shown here, would have thought of making an effective change by a pencil mark through some words, while that would be the natural course of some person contemplating revision. The second

is that the effect of erasing these words would be, as is now claimed, to give Halliday the fee without any reference to whether or not he had children, while the next paragraph, which remained undisturbed, provided for the disposition of the estate in case Halliday should die without issue. The erasure of the words "heirs of his body," without substitution of anything else, would be quite inconsistent with the next paragraph.

Hence we are led to the conclusion that this will, as duly probated, should be deemed to read "in trust for the heirs of his body." We are aware that this reasoning has the color of ourselves determining the contents of the will, as a court of probate might do; but we see no alternative between this treatment and a conclusion that the will has never been probated, because the probate order is so ambiguous as to be wholly unintelligible and ineffective; and we are not ready to adopt this conclusion.

Such interests as the grandmother had, which she might pass by her will, came through the will of the grandfather. So much of that as is material is as follows:

"I. I give, bequeath & devise to my beloved wife, Lettie Ann Joy, my entire estate of lands, stock, notes and all other property of which I may be possessed or which may be due or coming to me at the time of my death—to be used & controlled by her; after paying all just claims against my estate, in such manner as she may think prudent and best. I fully & freely confide in her to provide for & aid such charities as she knows I desire to be aided.

"II. Should the income from our farm not prove sufficient for the comfortable maintenance of my wife, Lettie, I do hereby authorize her to contract, sell & dispose of such parts of the farm as she may think best to provide for her maintenance and the charities before referred to in item I, and deeds to execute & deliver therefor.

"III. Within three months after my decease, I desire my beloved wife Lettie to execute her last will and testament, disposing of the entire estate in accordance with my wishes, well known and understood by her. Should circumstances demand it, she shall execute other and later wills, providing for the disposition of my estate, always, however, keeping in mind my beloved daughter, Annie Joy Halliday, and the issue of her body.

"IV. Should any devisee or legatee of either myself or my beloved wife institute or cause to be instituted any legal proceeding to set aside or thwart the purposes or provisions of either this will or the last will & testament of my wife, such devisee or legatee shall be by such action, cut off & deprived any portion of my estate."

[10] It was evidently the thought of this testator to give to his widow a life interest, and to give her a measure of discretion, by appointment, as to the remainder. There has been much discussion as to whether the right to consume or divert and the power of appointment were so unlimited as to give to her a fee instead of a life estate; but, in the view we take, it is not important to decide this question, nor yet to determine whether the reference to the persons whose interests are to be kept in mind, "Annie Joy Halliday [the mother] and the issue of her body," operates in a dispositive way or is only precatory. We may, without deciding, assume that the grandmother did not take a fee, and that her power of appointment was so circumscribed that the estate in her hands was charged with a trust to appoint as directed, and so come to the interpretation of that trust. If the disposition or

appointment which the grandmother made by her will, as we have found her will to be, was within the limit of her discretion in the execution of this trust, it is not necessary to go further.

In determining the meaning of this phrase "keeping in mind," etc., we are aided by the facts that at the time of the grandfather's death the mother was 32 years old, that Halliday was then her only child, and that his father was, to some degree, improvident and unsuccessful. The provision that after the mother had once made appointment by will 'she might thereafter make substituted appointments as the circumstances might change shows that the grandfather had no hard and fast plan in mind. We can think of no reason why the testator should have wished to tie up the estate in the hands of his daughter, except that he either distrusted her ability or her husband's influence, or both, nor any reason why he should have wished it to be free from restriction the moment it reached Halliday rather than to be tied up for his life. The grandmother, who knew his wishes and who executed her will very soon after his, has, by her action, declared that she thought that she was complying with his wishes when she treated the children of Halliday as within the class described by him as the issue of the mother. Her action seems to us fully to satisfy the reasonably probable intent of the grandfather and to be a fair exercise of that discretion and judgment undoubtedly reposed in her.

There is nothing in the language of the devise which prevents this conclusion. "Issue of the body" is commonly used in a less restricted and technical sense than "heirs of the body" (Daniel v. Whartenby, 84 U. S. [7 Wall.] 639, 643, 21 L. Ed. 661), and the word "issue" will be construed to include grandchildren unless the circumstances otherwise require (Adams v. Law, 58 U. S. [17 How.] 417, 421, 15 L. Ed. 149; Jackson v. Jackson, 153 Mass. 374, 26 N. E. 1112, 11 L. R. A. 305, 25 Am. St. Rep. 643: Jarman on Wills, vol. 2, p. 33; Page on Wills, § 526).

She was to "keep in mind the interests of" (among others) Halliday. His best interests might require—as the event shows—protection against himself. She had power to consume the estate for herself, to divert it to charities, and to change her once-made disposition. This power of change is almost meaningless, unless it refers to and reaches successive and variant dispositions made while "keeping in mind," etc., and we think necessarily indicates that she might make discretionary selection and inequality among the class of beneficiaries. Otherwise the grandfather might as well have made direct devise to his granddaughter and the issue of her body. Indeed, the very concession by all parties that the power existed for the grandmother to limit the mother's interest to a life estate rather than to make it a conditional fee admits the power to make more definite the application of the vague language of the supposed trust. No court can say that when she made Halliday a trustee of the legal title for his children, and therefore entitled to the possession and use of the farm only in their right, she was not "keeping in mind the interests of" the issue of her daughter, within the intent of the grandfather.

[11] This construction of the grandfather's will as supplemented by

the power of appointment does not, within the prohibition of the Ohio statute, grant any estate to any person not in being. If it leads to a fee in the grandmother—as we have assumed that it does not—that would not change the result in this case.

[12] It follows that Halliday had no title to the farm which he could mortgage or convey to any one or which passed to his trustee in bankruptcy. The precise character of the estate taken by his children does not now call for attention.

[13] The life estate of the mother could be mortgaged by her, and did pass to her trustee and seems to be of substantial value. It must therefore be determined whether the mortgage, as to that estate, was a forbidden preference.

The mortgage which is attacked as a preference was given to the bank on September 1, 1916, and was for $20,000. It covered the farm and was signed by Halliday and his mother. Since it affected only her life estate, we pass, without consideration, the claim of the bank that, because the mortgage was to secure money recently loaned to Halliday on the faith of the promise of a mortgage, the debt secured was not of the same class as others, and so the security could not be preferential, and we come to the claim of the plaintiff, as bankruptcy trustee for Halliday's mother, that the security was an invalid preference by her as against her estate in bankruptcy. We conclude that her debts and liabilities, on the date of the mortgage, were not such as to call for reasonable apprehension that she was insolvent. She had no liabilities, excepting as accommodation indorser upon about $50,000 of her son's notes. Of some of these the bank had no knowledge, and apparently, no notice; but we disregard that matter and take into the computation her entire debts. Her estate consisted of some miscellaneous items of about $2,000, her life estate in the farm, and an $11,000 claim against the railroad company for the recently sold right of way through the farm. It may be that this $11,000 was not really owing wholly to her. The sale was apparently upon the theory that it was by the grandmother, under the powers in the grandfather's will, and it was treated by all as having been practically completed before her death. In that event the proceeds were personal property, and passed to Halliday's mother under the grandmother's will. There is no reason for now excluding it from the computation of her assets. The evidence indicates that $18,000 was a fair estimate of the present value of her life estate in the farm. This should be computed as it would be if the fee was to be sold at judicial sale and the life estate treated as an incumbrance to be paid off. Treating it as worth only what it might sell for separately would be unfair. Her assets were thus at least $31,000.

[14, 15] We think it clear that upon the ultimate accounting as between the two estates in bankruptcy the mother's estate would be impaired only to the extent of the deficiency left on the indorsed notes after Halliday's estate was exhausted, and that, in estimating her insolvency for the purpose of determining the bank's duty of apprehension, we should take into account, not her total, contingent liability, but only such deficiency as ought to have been feared. We find no

express decision to this effect; though there is analogy to the joint and several liability of partners. See Jacobs v. Van Sickel [C. C.] 123 Fed. 340, 342; In re Hull (D. C.) 224 Fed. 796, 800. No doubt debts founded on indorsements may be proved against the indorser, but it does not follow that they must be taken at their face in forming a judgment as to the indorser's solvency. The method pursued by the trustee is to use the total of the indorsed paper in determining the maker's solvency, and then to use the same total again, as against the indorser's assets, to show her insolvency. We think this obviously unsound, particularly when the inquiry is not as to actual solvency, but only as to what future situation the creditor should reasonably anticipate. One who has ample property to pay his separate debts cannot be subject to be put into bankruptcy because he is also indorser for a solvent maker; but this is the alternative to the rule we have stated. Halliday had been for some time carrying on an extensive creamery business. He had upon the farm a herd of valuable cattle and appropriate buildings and apparatus, was buying milk and cream in quantities, and shipping butter to other parts of the country. The necessity alleged by him to the bank for his increasing loans was that the business was increasing so rapidly that it took larger and larger capital to carry it. As late as October he stated to the bank that he and his mother [the record says wife] had a net worth of $130,000. This probably was intended to include the value of the farm, but deducting this would leave a net worth of $80,000 or $90,000. The directors of the bank then made him an additional loan of $3,500. We cannot accept the suggestion that this was made with knowledge of his insolvency and to enable him to keep the business going until the mortgage of September 1st should become unassailable by the lapse of four months' time: First, because this rests only on surmise; and, second, because, when the bank, on November 16th, first received a statement showing the full amount of his debts and the small sum of his receivables, it refused to honor a small overdraft, and thus precipitated the collapse—action entirely inconsistent with the surmised intent. It seems probable that Halliday was generally regarded as conducting a prosperous business, and we have no doubt that the bank, as late as October, considered him solvent. The district judge, upon a careful review of the evidence, concluded that the proof sufficiently established that the bank ought to have believed him to be insolvent, or at least had reasonable ground so to believe. We are not inclined to question this conclusion, but it does not go far enough to be controlling. In order to make the mother insolvent, it was necessary that Halliday should be not merely insolvent, but so badly short that his assets would pay only about 40 per cent. of his debts.[1] The controlling question, therefore, is whether the bank had reason to believe that Halliday was so badly insolvent that the deficiency coming against his mother on

---

[1] If his debts were $70,000 and the indorsed paper $50,000, to bring a deficiency of $30,000 on the $50,000 would require a shortage of $42,000 on the $70,000, indicating ability to pay only 40 per cent. If his debts were only $60,000, there must be a shortage of $36,000 to carry over $30,000 against the indorser, thus indicating the same dividend.

account of the paper she had indorsed would be more than $30,000. The court below did not consider this question in this aspect.

[16, 17] The burden of proof is on the trustee to establish such reason to believe on the part of the bank (Kimmerle v. Farr [C. C. A. 6] 189 Fed. 295, 297, 111 C. C. A. 27), and the burden of proof was not changed by the amendment of 1910 of the Bankruptcy Act (36 Stat. 838), though the fact to be proved was affected (Baxter v. Ord [C. C. A. 6] 239 Fed. 503, 504, 152 C. C. A. 381; Pyle v. Texas Co., 238 U. S. 90, 98, 35 Sup. Ct. 667, 59 L. Ed. 1215). A review of all the evidence compels us to think that the trustee has failed to satisfy this burden, and that the securities given to the bank by the mother on her property cannot be successfully attacked as preferences by her. When the present Bankruptcy Law (Comp. St. §§ 9585–9656) was enacted, the phrase "reasonable cause to believe," in this very connection, had been judicially defined to mean, not mere suspicion, but "such knowledge of the facts as to induce a reasonable belief," "cause for well-grounded belief." That definition follows the phrase into this act; and it has been so construed and applied by this court. Grant v. National Bank, 97 U. S. 80, 81, 24 L. Ed. 971; Stucky v. Masonic Bank, 108 U. S. 74, 75, 2 Sup. Ct. 219, 27 L. Ed. 640; In re Eggert (C. C. A. 7) 102 Fed. 735, 43 C. C. A. 1; Carey v. Donahue (C. C. A. 6) 209 Fed. 328, 331, 126 C. C. A. 254; Baxter v. Ord, supra.

This conclusion disposes also of the attack made by her trustee upon the payment of about $10,000 made by her on September 16th. She devoted $10,000 of the money received from the railroad right of way to retiring that amount of paper in the bank which she had indorsed for her son, and we assume that the taking up of rediscounted paper was equivalent to the payment of direct paper. It is true that this payment reduces her separate assets by the sum of $10,000, but it reduced by the same amount Halliday's debts to the bank and any possible deficiency which could come against her on her indorsement. The situation, therefore, as to this alleged preferential payment differs only in degree from that of the mortgage of September 1st, and is covered by the same conclusion.

Since we sustain the mortgage given to the Delaware bank to the extent of the mortgagor's title, it is not necessary to consider separately the rights of the City National Bank as assignee of the mortgage.

[18] Motions have been made to dismiss the appeals because they present only proceedings in bankruptcy rather than controversies, and therefore should have been brought to this court by petition to revise. These motions are based upon In re McMahon, 147 Fed. 684, 77 C. C. A. 668, and Bank v. Title Co., 198 U. S. 280, 25 Sup. Ct. 693, 49 L. Ed. 1051. All the matters involved took such shape that it was necessary for this court to pass upon the facts, and we think the right to have review by appeal is sustained by Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Moody v. Century Bank, 239 U. S. 374, 36 Sup. Ct. 111, 60 L. Ed. 336; Weidhorn v. Levy, 253 U. S. 268, 40 Sup. Ct. 534, 64 L. Ed. 898; Barnes v. Pampel (C. C. A. 6) 192 Fed. 525, 528, 113 C. C. A. 81. These motions to dismiss are denied.

Upon the appeal of the children, No. 3444, the decree below, as to them, will be reversed, and the bill, as to them, dismissed. Upon appeal of the City National Bank, No. 3442, with reference to the mortgage on the farm, the decree will be reversed and modified so as to sustain the mortgage to the extent of the title possessed by Annie Joy Halliday, the mother. On the appeal of the Delaware National Bank, No. 3443, as to the preferential payment, the decree will be reversed, and the bill dismissed.

The appellants will recover their costs upon all the appeals. The cases will be remanded for the entry of new decrees and further proceedings in accordance with this opinion.