## PYLE, TRUSTEE IN BANKRUPTCY OF STEELE, MILLER & COMPANY, *v.* TEXAS TRANSPORT & TERMINAL COMPANY.

### APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

Nos. 226, 227, 228, 229, 230. Argued April 16, 19, 1915.—Decided June 1, 1915.

Whether the one receiving property from the bankrupt before the petition has cause to believe that he was receiving, and that it was intended to give to him, a preference is a matter of fact, and in an action to recover the property the burden of proof is upon the trustee.

In this case, parties who had advanced money on forged bills of lading in the belief that they represented the goods actually moving from designated points of shipment and had, just before the petition, received from the bankrupt genuine bills of lading representing the same goods, physical possession of which was in the carriers issuing the genuine bills, were entitled to possession of the goods; and, under the circumstances of this case, the substitution of the genuine, for the false, bills did not amount to an illegal preference under the Bankruptcy Act.

203 Fed. Rep. 1023, affirmed.

THE facts, which involve the right of a trustee in bankruptcy to maintain an action for the recovery of property of the bankrupt and what constitutes a preference under that Act. are stated in the opinion.

*Mr. Wm. C. Dufour,* with whom *Mr. W. J. Lamb, Mr. H. Generes Dufour* and *Mr. George Janvier,* were on the brief, for appellant:

The preference was an unfair one.

The French bankers considered conditions abnormal. The time of preference and the relations of Scheuch & Co. show that there was a preference.

The whole cotton world had been placed on guard by Knight, Yancey failure.

"Kiting," such as occurred in this case, is first sign of insolvency.

The security given up was worthless and the substitution of good security amounted to a preference.

In support of these contentions, see *Alexander v. Redmond,* 180 Fed. Rep. 96; 24 Am. & Eng. Enc. 1066; *The Carlos F. Roses,* 177 U. S. 671; *Coleman v. Decatur. Egg Co.,* 186 Fed. Rep. 136; 2 Cyc. 565; *First Natl. Bank v. Abbott,* 165 Fed. Rep. 853; *Forbes v. Howe,* 3 A. B. R. 475; *S. C.,* 102 Massachusetts, 427; *In re Gesas,* 146 Fed. Rep. 734; *Great Western Mfg. Co.,* 152 Fed. Rep. 123; *Hentz v. Lovell,* 192 Fed. Rep. 762; *Re Hoghton Web Co.,* 185 Fed. Rep. 213; *Hoover v. Maher,* 51 Minnesota, 53; *Lewis v. Julius,* 212 Fed. Rep. 225; *Lovell v. Newman,* 192 Fed. Rep. 753; *Re Manning,* 123 Fed. Rep. 180; *Re McDonald,* 178 Fed. Rep. 487; *Obiter Iron Co. v. Rolling Mill Co.,* 125 Fed. Rep. 794; *Parker v. Black,* 143 Fed. Rep. 561; *Re Reese Brick Co.,* 131 Fed. Rep. 643; Remington on Bankruptcy, page 774; *The St. Jose Indiano,* 1 Wheat. 208; *Sawyer v. Turpin,* 91 U. S. 114, 120; *Soisson v. First Nat'l Bank,* 131 Fed. Rep. 643; *Stewart v. Platt,* 101 U. S. 731; *Re Deuschle,* 182 Fed. Rep. 435; *Re Virginia Hardwood Co.,* 139 Fed. Rep. 209.

*Mr. Victor Leovy,* with whom *Mr. George Denegre* and *Mr. Joseph Paxton Blair* were on the brief, for appellees.

MR. JUSTICE MCREYNOLDS delivered the opinion of the court.

These causes, begun at the same time, were tried and decided together in the United States District Court, Eastern District of Louisiana (192 Fed. Rep. 725), and also in the Circuit Court of Appeals (203 Fed. Rep. 1023).

The original bills, except as to details concerning times, amounts, etc., are essentially identical; by stipulation the evidence in each one became part of the record in the others; and all the appeals may be conveniently considered in a single opinion.

The proceedings were instituted August 18, 1910, by Pyle, Trustee in bankruptcy of Steele, Miller & Company, to recover 2,494 bales of cotton in custody of an ocean carrier at New Orleans, transfer of which by the bankrupts to appellee banks, acceptors of their twenty-five drafts aggregating $183,048.46 it is alleged, constituted a preference voidable under §§ 60-*a* and 60-*b* of the Bankrupt Law (c. 541, 30 Stat. 544, 562) as it stood after amendments of February 5, 1903 (c. 487, 32 Stat. 797, 799, 800), and prior to June 25, 1910 (c. 412, 36 Stat. 838, 842). These sections are copied in the margin.[1]

Steele, Miller & Company were merchants at Corinth, Mississippi, engaged in exporting cotton. Scheuch & Company were merchants and importers domiciled at

---

[1] Sec. 60-*a*. A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required.

Sec. 60-*b*. If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person. And, for the purpose of such recovery, any court of bankruptcy, as hereinbefore defined, and any state court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction.

Havre, France.   The Bank de Mulhouse, Comptoir
D'Escompte de Mulhouse, Societe Generale, and Credit
Havrais are French banks doing business at Havre; and
Paul Chardin is a banker and cotton merchant of that
city.   The Compagnie Generale Transatlantique is an
ocean carrier.   It owned the steamship *Texas;* and Texas
Transport & Terminal Company was its agent at New
Orleans.

In 1909 the bankrupts engaged to consign large quan-
tities of cotton to Scheuch & Company for sale, and the
latter on their own responsibility arranged for reimburse-
ment credits with the banks, who, according to estab-
lished trade custom, undertook to accept drafts drawn on
themselves by consignors for value of shipments when
accompanied by proper bills of lading, insurance papers,
etc.—"all necessary documents."   In the honest course
Steele, Miller & Company delivered 100 bales of cotton to
a railroad carrier for through shipment to Havre taking
therefor a bill of lading to their own order containing
marks, number of bales, etc., and direction to notify
Scheuch & Company.   The bill with accompanying doc-
uments was then annexed to a draft for the consignment's
approximate market price, addressed to the Havre bank
and specifying (marks being changed to meet the circum-
stances) "value received and charge to account R. D.
A. R. 1/100 bales cotton."   This was discounted and
ultimately accepted and paid.   Upon arrival at Havre
the drawee bank received and held the cotton until reim-
bursed by Scheuch & Company.

Finding themselves in financial difficulties Steele, Miller
& Company prior to September, 1909, began to forge
and use through railroad bills of lading resembling genuine
ones in all respects.   Having utilized one of these to pro-
cure discount of a draft they would thereafter assemble
100 bales marked with a combination of four letters
identically as designated in the false instrument, forward

these to New Orleans, and there deliver them to an ocean carrier receiving a port or ocean bill of lading to their own order bearing the same identifying marks, etc. The genuine bill would then be sent by mail to Scheuch & Company with instructions to deliver to the bank holding corresponding forged one and return the latter. Such requested exchanges were made through a considerable period, the banks having been satisfied by a plausible explanation that bankrupts had made some arrangement with the carriers and that shipments were thus expedited, given through Scheuch & Company who, although at first ignorant of the frauds, were fully informed as early as March, 1910.

During December, 1909, and January and February, 1910, the bankrupts drew the twenty-five drafts—each for about $7,300, approximate market value of 100 bales—here involved on the separate appellee banks, attaching to each a fictitious through railroad bill of lading; and in due course these were accepted and paid in entire good faith. Prior to April 6, 1910, while insolvent, the bankrupts assembled in Mississippi and Tennessee the number of bales specified by the several forged bills marked as therein stated, shipped them to New Orleans and there delivered them to the Compagnie Generale Transatlantique for transportation to Havre. The ocean carrier issued to bankrupts for each 100 bales a port or ocean bill with same marks, etc.; and placed cotton aboard the *Texas*. The bankrupts promptly endorsed the genuine bills and forwarded them by mail to Scheuch & Company with directions to deliver to banks holding corresponding fictitious ones and return the latter. Deliveries were made in Havre on April 26, May 3 and May 7; but because of disquieting rumors concerning wrongful practices by others the banks retained both forged and genuine documents. They had no actual knowledge of the frauds practiced upon them until May 8, when information was received

concerning the receiver's bill filed during the preceding day.

About April 20, 1910, the failure of Knight, Yancey & Company & Company, large exporting cotton merchants at Decatur, Alabama, was announced, and shortly thereafter wide publicity was given to the fact that they had made extensive use of forged through railroad bills of lading with foreign drafts. Steele, Miller & Company suspended payment April 29; bankruptcy proceedings were instituted against them May 4; removal from New Orleans of cotton covered by the above-described ocean bills was enjoined in a proceeding by the receiver filed May 7; and on August 18 the instant causes were begun.

The bill in No. 226 (typical of all) alleges—"Steele, Miller & Company, being then insolvent, with intent to prefer said Bank of Mulhouse or Scheuch & Company, or both of them, over their other creditors, did deposit in the United States mail the said port bills of lading, the said bills of lading being addressed to Scheuch & Company, and the same having been endorsed by Steele, Miller & Company, the object and purpose of forwarding said port bills of lading being to substitute the same for the forged and worthless bill or bills of lading attached to the drafts held by the said Bank of Mulhouse or Scheuch & Company, or both of them, and that said port bills of lading in due course were received by Scheuch & Company and delivered to the Bank of Mulhouse. . . . Your orator avers that the transmission of said port bills of lading to be substituted for the said fraudulent bills of lading was done with the intent to prefer the said Bank of Mulhouse, and that when the said bills of lading were mailed to the said Scheuch & Company for delivery to the Bank of Mulhouse, and were received by the said Scheuch & Company and delivered to the Bank of Mulhouse, the said Scheuch & Company and the said Bank of Mulhouse, in accepting the said bills of lading and permitting the sub-

stitution of the said valid and port or custody bills of lading for the worthless bills of lading then held, knew or should have known and had reasonable cause to believe, that a preference was thereby given and intended, and knew or should have known that Steele Miller & Company was at said time insolvent, and that the effect of the mailing, the receipt and acceptance and substitution of said bills of lading was to enable the said Scheuch & Company or the said Bank of Mulhouse to obtain payment of its said draft; and your orator now charges that the effect of the act hereinabove described, if maintained and permitted by this Honorable Court, will be to enable the said Bank of Mulhouse or Scheuch & Company, or both of them, to obtain a greater per cent. of their said debt than any other creditor of said bankrupt, and that such acts should be set aside. Your orator charges the acts hereinabove complained of were performed within four months prior to the filing of the petition of involuntary bankruptcy herein, and your orator is advised that the act or acts complained of are voidable at his election, and he does now elect to avoid the same and files this his bill to avoid said transfor." And it prays "that upon the final hearing of this bill this Court will set aside the transfer of the said 900 bales of cotton by the said bankrupt to the said Bank of Mulhouse or Scheuch & Company, or both of them, and hold the same void and of no effect, and decree that the title to the said cotton and the right of possession thereof is in your orator and will permit your orator to take possession of said cotton and administer the same, or the proceeds thereof, for the benefit of the creditors." . . .

Appellant trustee maintains that he is seeking to set aside a preference as authorized by statute; that the French banks became mere ordinary unsecured creditors of Steele, Miller & Company by paying drafts with forged bills of lading attached as security; and that when genuine bills were substituted for spurious ones these banks had

positive information of the bankrupts' insolvency and knew or should have known that they were receiving an intended preference.

In behalf of appellee banks it is insisted that the transactions between them and bankrupts were in the nature of sales and by marking and shipping the cotton before bankruptcy it was appropriated to the contracts; that bankrupts had no purpose to give a preference; and certainly the banks had no reasonable cause to believe they were receiving an intended preference.

. The trial judge, relying upon "*The Idaho*," 93 U. S. 575, held the cotton was appropriated before bankruptcy to prior contracts between the parties. He further said: "I am not convinced that Steele, Miller & Company intended a preference, as it seems to me they uniformly discounted drafts purporting to be secured by bills of lading for cotton, which were in reality forged, and thereafter shipped the cotton to prevent discovery of their dishonest methods, and that their transactions with the bank were in the usual course of business and without any intention on their part other than to conceal their true methods. Furthermore, while the facts on which they might be charged with notice ought to have excited the suspicion of the bank, I am not prepared to say that they had knowledge, constructive or actual, of Steele, Miller & Company's insolvency, or that a preference was intended." The bill was accordingly dismissed and the Circuit Court of Appeals affirmed this action upon authority of *Lovell* v. *Newman & Son*, 192 Fed. Rep. 753, and *Hentz & Co.* v. *Lovell*, 192 Fed. Rep. 762.

Admitting that title to the cotton in question passed, the trustee now seeks annulment of the consummated transfer because a preference would result therefrom. In *Lovell* v. *Newman & Son, supra*, recovery was asked upon the theory that the title had remained in the bankrupts. By the statute's very words in order to set aside such a

transfer and recover the property it must appear that "the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference." Whether such "reasonable cause to believe" existed is a question of fact and the burden of proof is upon the trustee. *Coder* v. *Arts*, 213 U. S. 223, 240; *Wright* v. *Sampter*, 152 Fed. Rep. 196, 198; *McNaboe* v. *Columbian Mfg. Co.*, 153 Fed. Rep. 967, 968; *Tumlin* v. *Bryan*, 165 Fed. Rep. 166, 167, 168; *Reber* v. *Shulman*, 183 Fed. Rep. 564, 565; *Kimmerle* v. *Farr*, 189 Fed. Rep. 295, 299–300; *Mayes* v. *Palmer*, 208 Fed. Rep. 97, 98, 101.

Considering the whole record we are unable to conclude that appellee banks had reasonable cause to believe that by transferring the genuine bills of lading to them a preference was intended or given; and accordingly without undertaking to decide other interesting questions raised we must affirm the decree of the court below. Prior to May 8, 1910, the banks thought the forged bills in their keeping represented cotton actually moving from designated points of shipment. They were unaware of the bankrupts' crimes; and in the circumstances we cannot say they either believed or ought to have believed that they were receiving anything more than new receipts for their own property physical possession of which had passed during transit from a responsible railroad to a trustworthy steamship company.

*Affirmed.*