**HARRISON v. MERCHANTS NAT. BANK
OF FORT SMITH, ARK.**

**In re HAYNES' ESTATE.**
No. 11989.

Circuit Court of Appeals, Eighth Circuit.
Jan. 19, 1942.

J. M. Smallwood, of Russellville, Ark., for appellant.

Harry P. Daily, of Fort Smith, Ark. (John P. Woods and J. S. Daily, both of Fort Smith, Ark., on the brief), for appellee.

Before SANBORN and JOHNSEN, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

This is an appeal from a judgment entered for the appellee bank in a suit brought by the Trustee in Bankruptcy to set aside, as preferential, certain pledges to the bank of frozen poultry, including the amounts received by the bank from the sale of these pledged assets. The parties will be referred to as the Trustee and the Bank.

The transactions which gave rise to this controversy are essentially these: S. L. Haynes, the bankrupt, was engaged in the poultry business at Fort Smith, Arkansas. At first he confined his operations to the buying and selling of live poultry. Later, he decided to handle frozen poultry and obtained an outlet for such business with the Campbell Soup Company, of Camden, New Jersey. He had very little capital and made arrangements with the Bank to carry his account on an overdraft basis. This arrangement continued for about a year, when it appeared that Haynes' business had steadily grown, requiring more satisfactory financing. Thereupon, on February 25, 1939, Haynes entered into a written contract with the Bank, by the terms of which the Bank agreed to extend to him a line of credit on an overdraft basis, but not to exceed $20,000 at any one time. Haynes agreed that all warehouse receipts issued by the Ward Ice Industries, where the poultry was to be frozen and stored, should be issued in the name of the Bank and delivered to it, and that the warehouse, in holding and storing the poultry delivered to it from time to time by Haynes, should hold possession of the poultry for the Bank as security for the indebtedness and subsequent advances made by it.

The contract further provided that, in order to facilitate the shipments to the Campbell Company, Haynes would promptly load and ship the poultry to this company with a draft drawn on it in favor of the Bank, with bills of lading attached. The Ward Ice Industries was a party to this agreement. Later, on or about April 4, 1939, by an arrangement agreeable to all parties, the sales of poultry to the Campbell Company were accomplished in the following manner: Purchase orders were sent to Haynes by the Campbell Company, and thereupon invoices for such carload shipments would be prepared. Haynes would then take these invoices to the Bank and the Bank would draw a sight draft for eighty per cent of the amount of the invoices and attach a draft to the shippers' order bill of lading. Upon taking up the bill of lading, the Campbell Company remitted the amount of the sight draft direct to the Bank. After the receipt of the car, the balance of twenty per cent was remitted by the Campbell Company to the Bank by a check payable to Haynes and the Bank jointly. From May 28, 1939, to June 5, 1939, 250 barrels of dressed poultry had been pledged pursuant to this contract. Shipments of this poultry were all made prior to July 25, 1939, when Haynes was adjudicated a voluntary bankrupt. The Trustee claims that the pledge of this poultry constituted a preference, and seeks to recover the proceeds of the sale of the poultry which the Bank has received.

The assignment of errors by the Trustee presents but two issues: (1) Did the trial court err in finding that the Bank had no reasonable cause to believe that Haynes was insolvent prior to June 5, 1939; and (2) did the trial court err in holding that the Bank did not lose its right as pledgee of the poultry by reason of the sale to the Campbell Company?

It is conceded that, on June 5, 1939, the Bank knew, or had reasonable cause to believe, that Haynes was insolvent. It was on this day that the Bank refused to honor Haynes' checks and refused to accept any further pledged security to reduce its overdraft. The Trustee strenuously urges that, on May 8, 1939, when an audit was furnished to the Bank of Haynes' affairs, the Bank knew or had reasonable cause to believe that Haynes was insolvent. This audit showed a net worth of only $1,662.94, but it reflected a net loss of $3,523.77 since January 1, 1939. It is recognized that, in considering this audit, the president of the Bank was not

only disappointed at the progress which Haynes had made in connection with his affairs, but stated in substance, after considering the audit, that he did not see how the Bank could go along any further with him. However, it appears that, during this conference, a dispute arose as to the correctness of the audit which had been submitted. Haynes attempted to point out that the audit was incorrect in certain particulars and specifically with reference to the amount of vouchers outstanding for poultry purchased. It may be gathered from the testimony that Haynes was able to convince the Bank that the audit was not a fair test and did not reflect a true condition of his affairs, primarily on account of the way in which the books had been kept by a former bookkeeper. The accountant who made the audit conceded at the time of this conference that he could not say that the position taken by Haynes with respect to certain phases of the audit in controversy was not correct. In any event, the Bank was apparently of the opinion that Haynes should be given a further trial, and it was agreed that the Bank should "go along with him" for another thirty days. It may be noted that, on May 8th, the Bank was fully secured to the extent of Haynes' overdrafts, which at that time aggregated approximately $17,000. After the conference on May 8th, the business transactions between Haynes and the Bank proceeded as theretofore. His checks were honored, and on June 5th his overdraft totaled $20,725.73. In the meantime, however, a second audit had been completed as of May 31st, which was delivered to the Bank on June 5th, and this audit showed an indisputable loss during the month of May in the sum of $1,017.31. Thereupon, the Bank refused further credit and proceeded to foreclose its pledge.

Every claim of preference necessarily turns upon its own facts. That Haynes was actually insolvent some time prior to June 5th is not controverted. One may deduce from the audit of May 8th that the status of Haynes' affairs was not particularly encouraging. Undoubtedly, he was required to do business on a rather tenuous basis. The Bank may have known at that time that it was questionable how long he would be able to continue. That it was not too sanguine as to Haynes' ability to surmount his financial difficulties may be a fair assumption. However, Haynes apparently was confident that he

would be able to survive, and it was due to his assurance in this regard that the Bank went along with him. It is not made to appear that the Bank was motivated by the hope of any appreciable profit or personal benefit in consenting to continue the arrangement for another thirty days. The impelling fact is that, although the Bank was fully secured on May 8th, it agreed to extend Haynes further credit, and the overdraft from May 8th to June 5th was increased from approximately $17,000 to $20,725.73. As the result of extending Haynes further credit, the Bank sustained a loss of $1,560.54. Certainly, it is not reasonable to presume that, if it had been aware of Haynes' true condition, it would have continued the credit arrangement.

█ As one views any business failure in the retrospect, many incidents and circumstances bearing upon a bankrupt's financial condition loom much larger and more formidable than they did before the crash occurred. All well-considered cases have enunciated the doctrine that mere apprehension on the part of the creditor is not equivalent to good cause to believe that insolvency exists. Grant v. First National Bank, 97 U.S. 80, 24 L.Ed. 971.

█ "Reasonable cause to believe that a preference was intended cannot be held to be proved by circumstances that would merely excite suspicion. And circumstances may seem suspicious after the bankruptcy occurs that would not appear unusual at the time of their occurrence, and would then have presented no 'reasonable cause' on which to found a belief of intended preference. Merchants and other business men constantly continue to make payments up to the very eve of failure, and it would be disastrous to have them set aside on slight proof or mere suspicion." Sabin v. Western Dry Goods Co., 9 Cir., 2 F.2d 130, 131.

█ Emphasis is placed on the fact that, on February 28, 1939, when the financing contract was entered into, the Bank had approximately $1,900 of security for some $16,000 in overdrafts. But, at that time, it appeared that Haynes was in a reasonably thriving financial condition and operating a business which held out promise for a successful continuance. Furthermore, it fairly appears from the evidence that the pledges complained of were made to secure contemporaneous advances and not to secure an antecedent debt. The

mere business foresight, however, to obtain security some five months prior to bankruptcy for money advanced, and to be advanced, does not militate against the Bank's contention that it had every reason to assume that, at that time, Haynes' business was in a reasonably sound condition. The language used by the Supreme Court in Stucky v. Masonic Savings Bank, 1883, 108 U.S. 74, 2 S.Ct. 219, 27 L.Ed. 640, is particularly apposite. The court was considering the dealings of a creditor with a debtor in failing circumstances, and stated (page 75 of 108 U.S., page 220 of 2 S.Ct., 27 L.Ed. 640): "* * * He may feel anxious about his claim and have a strong desire to secure it, yet such belief as the act requires may be wanting. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by law."

■ The burden rested upon the Trustee to establish that the Bank had reasonable cause to believe that Haynes was insolvent prior to June 5, 1939 (Pyle v. Texas Transport & Terminal Co., 238 U.S. 90, 35 S.Ct. 667, 59 L.Ed. 1215), and that it therefore was receiving preferences by accepting pledges between May 28th and June 5th. That there was sufficient evidence to justify the court in concluding that the Trustee had not sustained this burden is free from doubt. We cannot say that the court's finding was clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The Trustee has cited several cases—In re Virginia Hardwood Mfg. Co., D.C.Ark.1905, 139 F. 209; Coder v. McPherson, 8 Cir., 1907, 152 F. 951; McElvain v. Hardesty, 8 Cir., 1909, 169 F. 31; Benjamin v. Buell, 7 Cir., 1920, 268 F. 792; Continental Nat. Bank v. Moore, 9 Cir., 1924, 299 F. 270—where the court affirmed the findings of the trial court, who determined that the parties involved knew, or had reasonable cause to know, that the bankrupt was insolvent at the time of the transactions referred to therein. But to show that a different conclusion had been reached in cases involving different facts and circumstances falls far short of establishing that the finding of the trial court herein is clearly erroneous.

■ Proceeding, then, to the second question presented: It is the Trustee's position that the permission given by the Bank to Haynes, whereby he was authorized to ship the pledged poultry in question to the Campbell Company under the arrangement referred to, constituted a surrender of the pledged chattels and a release of the lien of the pledge. That this contention is unsound and untenable seems evident. All of the pledged poultry was pledged between May 28th and June 5th and was shipped thereafter in the regular course of business on purchase orders given by the Campbell Company. The loading and shipment of the poultry was in conformity with the agreement entered into between the parties. The warehouse receipts were at all times in possession of the Bank. The poultry was in possession of the warehouse for the Bank. Any relationship of the pledgor to the shipments in question was merely that of an agent for the pledgee in effecting a sale of the pledged assets so as to apply the proceeds on the debt secured thereby. Everything which was done was mutually arranged by the pledgor and the pledgee in pursuance of a previous agreement. The prior arrangement between the parties was meticulously followed. The disposition of the property pledged under these circumstances does not constitute a waiver or a release of the lien of the pledgee.

■ The Trustee refers to certain Arkansas decisions in support of his position. Concededly, the nature and extent of any right created by the pledge and the effect of any waiver or release must be determined by the laws of that State. But there is no indication in any of the Arkansas decisions to which we are referred—Lee Wilson & Co. v. Crittenden County Bank & Trust Co., 98 Ark. 379, 135 S.W. 885; Umsted Auto Co. v. Henderson Auto Co., 137 Ark. 40, 207 S.W. 437; Union & Mercantile Trust Co. v. Harnwell, 158 Ark. 295, 250 S.W. 321; First National Bank of Mineral Springs v. McKee, 160 Ark. 63, 254 S.W. 382; Sharp v. Norwood, 188 Ark. 463, 65 S.W.2d 906—which departs from the statement in Jones on Collateral Securities, (1912) 3rd Ed., Sec. 43, p. 56, as follows: "A pledgee may employ the pledgor as his agent to sell goods held in pledge, and he does not lose his lien by allowing the pledgor to contract in his own name for their sale, or by delivering the goods on his order to the purchaser." The following cases are in accord: White v. Platt, 1848, 5 Denio, N.Y., 269; Thayer v. Dwight, 1870, 104 Mass. 254; Clark

v. Iselin, 1874, 21 Wall. 360, 22 L.Ed. 568; Winslow v. Harriman Iron Co., Tenn.Ch.App.1897, 42 S.W. 698; Stockyards National Bank v. First National Bank, 8 Cir., 1918, 249 F. 421; First National Bank of Portland v. Hall, D.C.Me. 1937, 18 F.Supp. 44.

No rights of the pledgee were disturbed by carrying out the terms of the agreement which the parties entered into. Any return of pledged property to Haynes, if the transaction is to be characterized as such, was for a special purpose. Reference is made to the fact that some of the shipments of the pledged property took place after June 5th when the Bank undoubtedly knew of Haynes' true condition. However, that fact cannot militate against the Bank's rights as pledgee. Its rights as pledgee had become fixed at that time. That proceedings were commenced to foreclose the pledge after knowledge of insolvency is immaterial. All of the proceeds of the sales were applied prior to adjudication in partial satisfaction of the debt which was secured by a valid pledge. Under these circumstances, no prejudice resulted to the Bank's rights. Dodge v. Harris, 8 Cir., 1915, 224 F. 434.

Finding no errors in the record, it follows that the judgment should be and is affirmed.