Charles E. HOPPE, Trustee of the Estate of Los Gatos Lumber Products, Inc., Bankrupt, Appellant,

v.

Emmet L. RITTENHOUSE, Appellee.

No. 16330.

United States Court of Appeals Ninth Circuit.

May 26, 1960.

Shapro & Rothschild, Arthur P. Shapro, Daniel Aronson, Jr., Burlingame, Cal., for appellant.

Emmet L. Rittenhouse, Santa Cruz, Cal., for appellee.

Before POPE, HAMLEY and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

The Trustee in Bankruptcy challenges as a voidable preference within the meaning of Section 60 of the Bankruptcy Act (11 U.S.C.A. § 96),[1] a secured creditor's claim filed by the appellee, E. L. Rittenhouse, contending that the evidence as a matter of law establishes first, that the bankrupt was insolvent when it gave the security in question, a note and mortgage executed by the bankrupt on December 14, 1956 to appellee's assignors, Paul Gammill and Paul Gammill, Jr., and second, that the mortgagee-assignors had knowledge of such insolvency when they received the mortgage. The referee in bankruptcy found against the trustee on both issues, and the District Court, on review of the matter, affirmed; the trustee now appeals to this Court. Jurisdiction of the court below was obtained under 11 U.S.C.A. § 67, sub. c; our jurisdiction is conferred by 11 U.S. C.A. § 47.

The question thus presented on appeal is whether the evidence supports these two ultimate findings by the referee. We believe it does.

The bankrupt, Los Gatos Lumber Products, Inc., a corporation organized under the laws of California, was engaged in sawing and selling lumber at Fulton, California, where it owned a sawmill, land and equipment in which it had a substantial investment. The business had been continually hampered by lack of adequate working capital, and

1. Section 60, sub. a(1) of the Bankruptcy Act (11 U.S.C.A. § 96, sub. a(1)), so far as pertinent, defines a preference as follows:
   * * * a transfer * * * of any of the property of a debtor to or for the benefit of a creditor for or on account of the antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy * * * the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.
   Subdivision b of the same section of the Act carries the further provision that:
   " * * * any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby * * has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent * * * "

the president of the bankrupt, Carl Morton, and members of his family, from time to time advanced substantial sums of money to it.

But these advances had not been adequate to meet the needs of the bankrupt and during the summer Morton made several unsuccessful attempts to sell or refinance the business. A financial statement prepared in August by a firm of auditors from the corporate books reflected as a liability an item designated "Notes Payable, Officers" in the sum of $173,813.12; this figure, Morton testified, represented the monies advanced by himself and his family; the statement also showed that the liabilities of the bankrupt exceeded its assets by $112,789.50. Finally, in September he sought a loan from the Small Business Administration, a Government agency, and to the application attached statements by the several members of the Morton family in which each stated his willingness to accept stock of the bankrupt in lieu of his debt and agreed to relinquish any claim as a creditor of the bankrupt on condition that "Los Gatos Lumber Products, Inc. obtain from the Small Business Administration, $150,000.00 to $175,000.00 of new financing within 90 days from the date hereof * * *."

However, private financial aid was finally obtained from Paul Gammill, Jr. and his father who were engaged in the logging business as partners and had throughout 1956 sold and supplied logs to the bankrupt. Business dealings between the bankrupt and the Gammills were largely, if not entirely, carried on by Carl Morton and Paul Gammill, Jr., but their association was not limited to the sale and purchase of logs alone: on numerous occasions during that year Carl Morton not only discussed with Paul Gammill, Jr. the continued need of the bankrupt for money with which to operate, but also showed him its books and the financial statement already mentioned; Paul Gammill, Jr. assisted Morton in attempting to sell the business and in preparing the loan application to the Small Business Administration. The first loan of the Gammills was made in October and additional loans were made throughout the remainder of the year and until the eve of the filing of the petition in involuntary bankruptcy against the bankrupt on January 22, 1957. In all, upwards of $29,000.00 was thus loaned by the Gammills, but at the time the note and mortgage were executed on December 14, 1956 the loans totalled $25,381.26; the consideration for the note, however, represented only a part of that sum.[2]

The above evidence, says the trustee, conclusively establishes that the corporation was insolvent and the Gammills knew it, stressing the additional undisputed facts that no stock was ever issued in lieu of these debts and that the members of the Morton family filed creditors' claims based upon these obligations in the bankruptcy proceeding.

In absence of other evidence, we would be disposed to accept the trustee's contentions, for the books of the bankrupt with which Paul Gammill, Jr. was familiar, clearly demonstrate that the assets of the bankrupt were less than the amount of its liability and this constitutes "insolvency" as defined in 11 U.S.C.A. § 1(19).[3] Langham, Longston & Burnett v. Blanchard, 5 Cir., 1957, 246 F.2d 529.

---

2. The amount of the note and mortgage was $12,025.00, less than half the amount then owing to the Gammills; this security was obtained under the following circumstances: in November 1956, the Gammills agreed to purchase the interest of one Kelly in their company; Kelly had decided to withdraw from the business, but the Gammills lacked roughly $12,000.00 of the amount need to purchase his interest; after some discussion, it was agreed that the note and mortgage be obtained from the bankrupt by the Gammills and assigned to appellee in trust for the purpose of applying the proceeds to the amount owing to Kelly by the Gammills.

3. A person is insolvent under 11 U.S.C.A. § 1(19) "* * * whenever the aggregate of his property * * * shall not at a fair valuation be sufficient in amount to pay his debts."

But there was considerable other evidence adduced at the hearing which must be given due consideration, and our view of this evidence is guided by the familiar rule that " * * * the district court and this court are required to accept the findings of the referee in bankruptcy, unless such findings are clearly erroneous." Costello v. Fazio, 9 Cir., 1958, 256 F.2d 903, 908; Lines v. Falstaff Brewing Co., 9 Cir., 1956, 233 F.2d 927; General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53; Rules 52(a) and 53(c), Federal Rules of Civil Procedure, 28 U.S.C.A.

Carl Morton himself testified that he and his family had agreed that they would accept stock in the bankrupt and relinquish their claims against it arising out of their advances if this would attract needed capital into the business. Morton further stated that during the summer he had advised a number of prospective lenders and purchasers, including Paul Gammill, Jr., of this agreement, and to further publicize it he had placed the notation "into stock" on the financial statement while attempting to either borrow money or sell the business. A letter written in April by Morton's mother tends to corroborate this testimony, for in it she expressly declares that her advances were for the purchase of stock and not a loan to the corporation.

The only other witness at the hearing was Paul Gammill, Jr., and his testimony corroborated Morton's in many essential details. It can appropriately be summarized as follows: at several meetings both Carl Morton and his wife, had expressed to him a willingness to accept stock of the bankrupt in lieu of their advances should a loan be obtained or the business sold; at another meeting, George Stepovich, Morton's attorney had suggested, and Morton agreed, that " * * * those notes would be cancelled and made into stock"; as a result of these meetings and further dealings with the Mortons, it was Gammill's understanding that the Mortons' claims would be exchanged for stock of the bankrupt upon loans being made to the bankrupt by any one, not solely the Small Business Administration;[4] and lastly, the loans made by the Gammills were made in reliance upon this basic understanding.

The referee found "[t]he net worth of the Bankrupt corporation on the 14th day of December, 1956, was approximately $62,000.00," and this rests upon the further finding that the monies advanced to the bankrupt by members of the Morton family, " * * * were advanced to the corporation not as loans but as equity capital in the form of subscriptions to capital stock."

The undisputed evidence is thus that the Mortons had orally agreed to exchange their notes for stock in the corporation on the condition that additional working capital be obtained from some outside source, and that the corporation, through its president, Carl Morton, not only agreed to this proposal but actively sought additional financing from prospective lenders by positively asserting that the apparent indebtedness of the corporation to the Morton family would be erased as a liability when additional financing was obtained. There is little doubt that the Mortons intended to and did enter into a conditional subscription agreement. The critical question, then,

---

4. The specific testimony of Paul Gammill on this question was as follows:

"Q. With reference to these particular items marked Notes Payable to Officers: What was the understanding or agreement relative to your advances and those particular parts of interest on the balance sheet? A. Well, my understanding was—we had an agreement with Mr. Morton relative to the fact that the notes were to be capital stock—they were to be replaced by stock.

"Q. And was that at all times dependent upon the fact that it would be refinanced, or solely on the basis of your advances? A. Well, that was on the basis of any advances; it was discussed with a number of people."

is whether this agreement was binding and enforceable, for on it hinges the validity of the referee's finding that the Mortons' advances were "subscriptions", not "loans".

■ The validity of such a subscription agreement, determining as it does the nature and extent of the Mortons' interest in the corporation, is an ancillary question of local law; and since the bankrupt was incorporated under the laws of California and the agreement was entered into there, the laws of that state govern the inquiry. Kemp-Booth Co., Ltd. v. Calvin, 9 Cir., 1936, 84 F.2d 377; Imperial Paper & Color Corp. v. Sampsell, 9 Cir., 1940, 114 F.2d 49; In Matter of Terrace Lawn Memorial Gardens, 9 Cir., 1958, 256 F.2d 398.

■■ Under California law an agreement by prospective shareholders to purchase stock in a proposed corporation, or unissued shares in an existing corporation, is a binding and enforceable contract. Chater v. San Francisco Sugar Refining Co., 1861, 19 Cal. 219; Marysville Electric Light & Power Co. v. Johnson, 1892, 93 Cal. 538, 29 P. 126; Moser v. Western Harness Racing Ass'n, 1948, 89 Cal.App.2d 1, 200 P.2d 7. The proposal made by such subscribers must be accepted by the corporation before they are finally bound, and it is clear in the present case that Carl Morton, acting on behalf of the corporation, did so accept. See Marysville Electric Light & Power Co. v. Johnson, 1895, 109 Cal. 192, 41 P. 1016; Moser v. Western Harness Racing Ass'n, supra.

However, the agreement was entirely oral, and this raises the question whether it was rendered invalid because of the California Statute of Frauds, which provides as follows:

"A contract to sell or a sale of any goods or choses in action of the value of five hundred dollars or upward shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so con-tracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf." California Civil Code, § 1624a.

Apparently California has not ruled on this question so far as subscription agreements are concerned, but under the factual situation presented, we need not apply the general rules, for even conceding that the agreement was a "contract to sell * * * goods or choses in action" there was at least partial, if not total, performance under its terms. Full payment had already been tendered by the Mortons, and the corporation had secured performance of the required condition by obtaining additional financing from the Gammills; consequently, the essential terms of the agreement were executed, thereby exempting it from the Statute and rendering it enforceable though not in writing. Warfield v. Basso, 1923, 62 Cal.App. 47, 216 P. 48; Hildebrand v. Delta Lumber & Box Co., 1944, 67 Cal.App.2d 88, 153 P.2d 377; Sousa v. First California Co., 1950, 101 Cal.App.2d 533, 225 P.2d 955.

■ The trustee argues that because no stock was issued to the Mortons, they remained creditors and did not become subscribers of stock; but as in most cases, their status as subscribers is determined by the intention of the parties to the agreement. Hughes Mfg. & Lumber Co. v. Wilcox, 1910, 13 Cal. App. 22, 108 P. 871. Here the intention to convert notes into stock if additional capital was obtained is established by an abundance of testimony, and it is clear that the mere mechanical act of issuing stock certificates is not necessary to constitute the subscribers shareholders. Mitchell v. Beckman, 1883, 64 Cal. 117, 28 P. 110; United States Nat. Bank of Los Angeles v. Stiller, 1932, 216 Cal. 324, 14 P.2d 78; Meyer & Holler v. Ra-

mona Village, 1935, 5 Cal.App.2d 679, 43 P.2d 823, 44 P.2d 634.

It is true that the agreement was subject to a condition precedent, i. e., obtaining additional working capital, but that condition occurred when the Gammills began advancing considerable sums, which eventually exceeded $29,000.00, to the corporation. The condition thus having occurred, the contract became binding and constituted the Mortons shareholders instead of creditors, and as such, "beneficial owners" of the corporate assets. Lincoln Theatres Corp. v. Fleming, 4 Cir., 1933, 66 F.2d 441; Missouri Valley Cattle Loan Co. v. Alexander, 8 Cir., 1921, 276 F. 266; MacDermot v. Hayes, 1917, 175 Cal. 95, 170 P. 616; Newell-Murdoch Realty Co. v. Wickham, 1920, 183 Cal. 39, 190 P. 359.

■ Moreover, should we assume that the agreement was subject to some infirmity rendering it invalid, it is clear under California law that as between the Gammills and the Mortons, the latter would be estopped to deny their status as subscribers where, as here, the Gammills relied upon the agreement in making loans. In re American Aluminum Metal Products Co., D.C.Cal.1926, 15 F. 2d 234; Moore v. Moffatt, 1922, 188 Cal. 1, 204 P. 220; Reno v. American Ice Mach. Co., 1925, 72 Cal.App. 409, 237 P. 784.

The fact that the Mortons presented creditors' claims in the bankruptcy proceeding is not conclusive but at most creates a conflict in the evidence. Indeed, such behavior by subscribers follows a familiar pattern where efforts to continue the corporation in operation have failed: subscribers oftentimes endeavor to salvage something of their investment by attempting to qualify as creditors. See Collier on Bankruptcy (14th Ed. 1956) Vol. 3, § 63.06, p. 1777.

■ Yet even if the referee erred in his finding that the bankrupt was solvent when the mortgage was given, the order appealed from must still be affirmed unless he also erred in his finding that "Paul Gammill, Jr. and Paul Gammill, Sr. had no reasonable cause to believe that the bankrupt corporation was not solvent on the 14th day of December, 1956." Pyle v. Texas Transport & Terminal Co., 1914, 238 U.S. 90, 35 S.Ct. 667, 59 L.Ed. 1215; Harrison v. Merchants Nat. Bank, 8 Cir., 1942, 124 F.2d 871.

On this question, appellant likewise takes the position that the findings of the referee were based upon given facts, and consequently this court is at liberty to and should substitute its own factual conclusions for those of the referee under the authority of Costello v. Fazio, supra, 256 F.2d at page 908, where we stated the following rule:

"[w]here a finding of fact by the referee is based upon conflicting evidence, or where the credibility of witnesses is a factor, a district court and, on appeal, a court of appeals will seldom hold such a finding clearly erroneous. The same reluctance is not encountered with regard to a factual conclusion from given facts. In the latter case, the proper conclusion from given facts can be made by the trial judge, or the court of appeals as well as the referee."

■ The rule applied in Fazio is pertinent where the primary facts can fairly be said to admit of but one reasonable conclusion, and yet this principle does not change the equally settled rule that where the basic and undisputed facts are fairly susceptible of diverse inferences requiring different conclusions, the determination made by the trier of fact is conclusive on review unless that finding is "clearly erroneous." Security-First Nat. Bank of Los Angeles v. Quittner, 9 Cir., 1949, 176 F.2d 997. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394, 68 S.Ct. 525, 542, 92 L.Ed. 746.

The factual conclusion that the Gammills did not have "reasonable cause" to believe their debtor insolvent within the meaning of Section 60, sub. b of the Bankruptcy Act (11 U.S.C.A. § 96, sub. b), depends upon whether the facts known to them and any additional knowledge with which they are fairly chargeable would produce such a belief in the mind of an ordinarily prudent businessman. Grant v. Nat. Bank, 1877, 97 U.S. 80, 24 L.Ed. 971; Security-First Nat. Bank of Los Angeles v. Quittner, supra.

Thus, whether the Gammills had reasonable cause to believe the bankrupt was insolvent can only be fairly answered by considering the mortgage transaction in its proper perspective. Manifestly, the financial statement, the contents of the loan application, and the difficulties the bankrupt experienced during the year 1956 due to lack of capital—all matters upon which the appellant places great reliance—must be given due consideration in deciding the question of reasonable cause.

But what of the evidence regarding the understanding upon which the Gammills made their loans? Must we accept the trustee's proffered evidence as invincible and dismiss the other as wholly insignificant, requiring but one conclusion contrary to the finding of the referee? We think not. The evidence taken as a whole is clearly susceptible of more than one inference from which different conclusions could be reached; under such circumstances, the particular factual conclusions adopted by the referee are supported by substantial evidence.

We conclude, therefore, that the findings are not clearly erroneous.

POPE, C. J., who participated in the hearing and the conference on the above case, has not participated in the decision. At a later date, he may or may not, as he chooses, file a statement of his position in the case.